UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,          Case No. 5:24MJ1209
                              Akron, Ohio
     vs.                      Friday, September 6, 2024
                              11:34 a.m.
MICHAEL MONROE JAMES,

          Defendant.


          TRANSCRIPT OF DETENTION HEARING
     BEFORE THE HONORABLE AMANDA M. KNAPP
          UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:   Toni B. Schnellinger Feisthamel
                      Office of the U.S. Attorney - Akron
                      2 South Main Street, Room 208
                      Akron, Ohio 44308
                      (330) 375-5716

For the Defendant:    Edward G. Bryan
                      Office of the Federal Public Defender
                      Skylight Office Tower, Suite 750
                      1660 West Second Street
                      Cleveland, Ohio 44113
                      (216) 522-4856

Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
                      Federal Building & U.S. Courthouse
                      2 South Main Street, Suite 568
                      Akron, Ohio 44308
                      (330) 252-6021


Electronic recording transcribed by mechanical stenography
from a digital audio recording; transcript produced by
computer-aided transcription.

Friday, September 6, 2024

1

2  THE DEPUTY CLERK:  All rise.  This Honorable

3  United States Court for the Northern District of Ohio is now

4  open for the transaction of business, the Honorable Amanda

5  M. Knapp presiding.

6  Please be seated.

7  Your Honor, the case before the Court carries Case

8  Number 5:24MJ1209, United States of America versus Michael

9  Monroe James.

10  THE COURT:  All right.  Good morning, everyone.

11  Can I have appearances, please, from counsel.

12  MS. SCHNELLINGER:  Good morning, Your Honor.

13  Toni Beth Schnellinger for the United States.  I'm joined at

14  counsel table by Austin Johnston, special agent with the

15  FBI.

16  THE COURT:  Good morning, Special Agent Johnston.

17  MR. BRYAN:  Good morning, Your Honor.  Edward

18  Bryan on behalf of Michael James.

19  THE COURT:  All right.  And I see Mr. James

20  there.

21  Good morning, sir.

22  THE DEFENDANT:  Good morning, Your Honor.

23  THE COURT:  And we also have Pretrial Services

24  Officer Motley.

25  Good morning, Officer Motley.

1          THE PRETRIAL SERVICES OFFICER:  Good morning,

2     Your Honor.

3          THE COURT:  All right.  Mr. James, you're here

4     for a scheduled detention hearing pursuant to 18 U.S.C. 3142

5     on the government's motion for detention.

6          The issue before the Court is whether there is a

7     condition or combination of conditions that will reasonably

8     assure the safety of others and the community and your

9     appearance in the case.

10          Ms. Schnellinger, I believe you indicated at the last

11     proceeding that this is a matter to which the Crime Victims'

12     Rights Act occurs.

13          Is that correct?

14          MS. SCHNELLINGER:  Yes, Your Honor.

15          THE COURT:  And has the government fulfilled its

16     duty of notification to the extent possible?

17          MS. SCHNELLINGER:  At this time, yes.  We're

18     still continuing that process.

19          THE COURT:  Thank you.

20          Mr. James, as I indicated at your prior appearance,

21     you are entitled to be represented by counsel at every stage

22     of these proceedings.

23          The Court has previously appointed the federal public

24     defender to represent you in this case.

25          Do you understand Mr. Bryan is representing you as

1    your attorney today?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  Have both parties had an adequate

4    opportunity to prepare for today's proceedings?

5           MS. SCHNELLINGER:  Yes, Your Honor.

6           MR. BRYAN:  We have, Your Honor.

7           THE COURT:  And have both parties received the

8    pretrial services report?

9           MS. SCHNELLINGER:  Yes, Your Honor.

10           MR. BRYAN:  Yes.

11           THE COURT:  Ms. Schnellinger, it appears to the

12    Court that a statutory presumption of detention does exist

13    in this case under 18 U.S.C. 3142.

14       Does the government concur?

15           MS. SCHNELLINGER:  Yes, Your Honor.

16           THE COURT:  Mr. Bryan, does the defense concur

17    this is a presumption case?

18           MR. BRYAN:  We do, Your Honor.

19           THE COURT:  Mr. James, due to the nature of the

20    charges in this case, Congress has established a presumption

21    under 18 U.S.C. 3142(e)(3) that no condition or combination

22    of conditions will reasonably assure the appearance of the

23    person as required and the safety of the community.  That

24    presumption is subject to rebuttal by you.

25       While you have a burden of production to rebut the

1    presumption, the government retains the overall burden of

2    persuasion on the issue of detention.

3         At no time does the presumption in favor of detention

4    impact the presumption of innocence that applies in all

5    criminal cases.

6         I'm going to summarize now the procedure that we will

7    follow today.

8         Mr. James, at this hearing you will have the right to

9    cross-examine witnesses, if witnesses are presented, and to

10   present evidence through your counsel.

11        You also have the right to testify but are not

12   required to do so.  You have the right to remain silent.

13        You have the right to consult with your attorney at

14   any time during these proceedings.

15        The rules of evidence, other than with respect to

16   privileges, do not apply.

17        Hearsay evidence is admissible.

18        And both sides have the right to proceed in whole or

19   in part by way of proffer.

20        The evidence and examinations will be limited solely

21   to the detention determination.  The hearing is not to be

22   used to obtain discovery or produce testimony for subsequent

23   impeachment at trial.

24        I will not consider motions to suppress evidence or

25   objections to evidence allegedly obtained unlawfully.

1    The government will proceed first today with its

2 evidentiary presentation or proffer.

3    After that, the defense will have an opportunity to

4 present evidence or proffer.

5    I will allow rebuttal evidence as appropriate.

6    After all of the evidentiary presentations are

7 complete, that is when I will hear argument first from the

8 government and then from the defense.

9    Ms. Schnellinger, are you prepared to proceed?

10    MS. SCHNELLINGER:  Yes, Your Honor.

11    Your Honor, the United States would proffer the

12 affidavit in support of the criminal complaint.

13    We've also provided the Court and defense counsel

14 Government's Exhibit 1 which is a report of investigation.

15 We would proffer that.

16    We would also proffer the pretrial services report,

17 and we would point out that, as reflected on page 5 of the

18 report, that the pretrial risk assessment doesn't accurately

19 assess the defendant population involved in sex offenses.

20 We would point that out, Your Honor, and also the fact that,

21 in the last page, how the pretrial sentence report doesn't

22 reflect the weight of the evidence or rebuttable

23 presumptions.

24    Your Honor, we would call Special Agent Johnston to

25 the stand.

1          THE COURT:  All right.  Special Agent Johnston,

2     would you please come over here to the witness stand.

3                          AUSTIN JOHNSTON,

4          of lawful age, a witness called by the government,

5            being first duly placed under oath, was examined

6                       and testified as follows:

7              THE COURT:  You may inquire.

8              MS. SCHNELLINGER:  Thank you, Your Honor.

9            DIRECT EXAMINATION OF AUSTIN JOHNSTON

10    BY MS. SCHNELLINGER:

11    Q.    Sir, can you please state your name for the record.

12    A.    Austin Johnston.

13    Q.    By whom are you employed?

14    A.    The Federal Bureau of Investigation.

15    Q.    Where are you currently assigned?

16    A.    The Canton resident agency.

17    Q.    And what are your duties and responsibilities?

18    A.    To enforce federal violations, specifically those that

19    relate to violent crime and crimes against children.

20    Q.    And were you involved in the investigation of a

21    Michael Monroe James?

22    A.    I was.

23    Q.    What was your role in the investigation?

24    A.    It was shared with a task force officer that we have.

25    Ultimately our role was to make contact with Mr. James and

1    inquire about an interaction that he had online.

2    Q.    This interaction that you reference that he had

3    online, can you describe what that was?

4    A.    An OCE, which stands for an online covert employee,

5    that we have at the Federal Bureau of Investigation started

6    a chat on an application called Whisper, which is an

7    anonymous chat application which enables you to post

8    pictures, comments, essentially anonymously.

9          That covert employee had made a post, and Mr. James

10   had responded to that post.

11   Q.    And what was the nature of the conversation?

12   A.    The initial post stated something along the lines of

13   "My parents are going to kill me when they find out that I'm

14   pregnant."

15         That was the initial post made by the OCE.

16         And then that conversation was initiated by Mr. James

17   asking that OCE how old they were.

18   Q.    And how old did the online covert employee reference

19   that they were?

20   A.    Eleven years old.

21   Q.    And did the conversation with this alleged eleven year

22   old continue?

23   A.    It did.

24   Q.    What was the nature of the conversation?

25   A.    It was primarily driven by Mr. James.  His initial

1  response to the covert employee stating that they were

2  eleven was, "Really?  That's odd that you're pregnant.  Who

3  is the dad?"

4       Mr. James later sent a photo which was later

5  identified as Mr. James.  He was wearing a Taco Bell shirt.

6  And Mr. James was employed at Taco Bell.

7       Throughout the conversation, which was mainly driven

8  by Mr. James and little communication was made by the OCE,

9  Mr. James stated, "My dick is going to hurt you, but you

10  will love it in the end."

11       References getting the OCE pregnant and that "When

12  that child is born, when she turns six she will start to get

13  used like I use you."

14       Mr. James asked for the OCE's address so that he could

15  plan a trip.

16       Mr. James stated, "If you pass out, then I'll go

17  rougher.  You'll beg me to stop, and I'll shove my dick down

18  your throat until you can't breathe."

19  Q.   This was all through the OCE who he believed was

20  eleven years old?

21  A.   That's correct.

22  Q.   And is this entire conversation reflected in

23  Government's Exhibit 1?

24  A.   It is.

25  Q.   Did he send any other pictures besides the picture of

1    himself?

2    A.    He did.  He sent a photo of an erect male penis.

3    Q.    And did he make arrangements to meet with this eleven

4    year old?

5    A.    Attempted.

6    Q.    Did that ever occur?

7    A.    Not that we're aware of.

8    Q.    After -- where was this eleven year old supposedly

9    supposed to be located?

10   A.    In Ohio.  Toledo.

11         I don't -- she -- from my recollection, the specific

12   location was never stated.

13   Q.    And did your office receive this information?

14   A.    We did, yeah.  The OCE stopped communicating with Mr.

15   James and then forwarded the communication thread on to our

16   AOR.

17   Q.    And what's an AOR?

18   A.    Area of responsibility.

19   Q.    And why was that?  Why did your office get this

20   report?

21   A.    The OCE had determined the location based upon a

22   subpoena.  That subpoena came back to Massillon Cable which

23   was the internet provider for the household that the IP came

24   back to which was listed for David and Heather James which

25   are Mr. James's parents.

1   Q.    And the photo of the individual's face, did that match

2   who you believed to be Mr. James?

3   A.    Correct.

4   Q.    Then what happened once your office received the

5   report?

6   A.    Just based upon the report, we went out and made

7   contact with Mr. James at his residence, told Mr. James that

8   we had received a tip of information related to his online

9   use, engaged with a brief interview of Mr. James.

10        He provided consent for us to search his mobile device

11  and stated that he was using applications consistent with

12  the OCE report.

13  Q.    He was using the applications.  Did he admit anything

14  else on that occasion?

15  A.    He did admit that he had talked to minors.

16  Q.    Did he say how many?

17  A.    At that time I don't recall how many he had spoken to.

18  Q.    And you stated that you received consent to search his

19  phone?

20  A.    That's correct.

21  Q.    And your office then proceeded to do that?

22  A.    We did.

23  Q.    What was found on the his cellular phone?

24  A.    The report was done towards the end of July of this

25  year.  We located 764 files of CSAM which was a mixture of

1    both photos and videos.

2    Q.    What is CSAM?

3    A.    Child sexual abuse material.

4    Q.    And can you give the specifics of the CSAM found on

5    the phone?

6    A.    Sure.  Three of the files that we detailed, one of

7    which was a color image that depicted an adult male engaged

8    in genital-to-genital sexual contact with a nude infant

9    female.

10        The second one was a color image that depicted an

11   adult male engaged in genital-to-genital sexual contact with

12   a nude prepubescent female.  That image showed the female,

13   although it was an image, appeared to be screaming with her

14   mouth open and eyes wincing.

15        And then the third one that we reviewed -- or excuse

16   me, detailed, was another color image that depicted an adult

17   male engaged in genital-to-genital sexual intercourse with a

18   nude prepubescent male who had a blindfold on.

19   Q.    And based on your understanding of the investigation,

20   are the other 764 images and videos consistent with what you

21   just described?

22   A.    They were.

23   Q.    After your office had an opportunity to review

24   everything found on the phone, what happened next?

25   A.    We conducted a search warrant -- excuse me.  We did

1    not conduct a search warrant.

2         We received a warrant for Mr. James's arrest and

3    served that warrant.

4    Q.    What happened next?

5    A.    Subsequent to the arrest, we conducted another

6    interview of Mr. James at our office in Canton.

7    Q.    What did Mr. James tell you on that occasion?

8    A.    Mr. James stated that he had in fact been

9    communicating with minors previously for about the past two

10   years.  Between that time span, he had coordinated to meet

11   up with between two to ten minors but stated that he had

12   never actually done so.

13        And approximately ten times he had sent nude images of

14   himself to those minors.

15   Q.    Did he talk about any of the photos that were found on

16   his phone in reference to McDonald's?

17   A.    He did.  We, during the review of his phone, we had

18   located some photos of what appeared to be McDonald's

19   employees.

20        When we questioned Mr. James about that, he stated

21   that they were in fact McDonald's employees that he worked

22   with, and was using an AI generator to remove the clothing

23   and make them appear as if they were nude.

24   Q.    And these were female minors that worked at

25   McDonald's; is that correct?

1    A.    That's correct.

2    Q.    Did he state why he was doing that?

3    A.    For his own pleasure.

4    Q.    What do you mean by pleasure?

5    A.    I would just speculate that it was for sexual

6    gratification.

7                MR. BRYAN:  Objection.

8                THE COURT:  Yeah, sustained.

9    BY MS. SCHNELLINGER:

10   Q.    Did he describe anything regarding the individuals

11   that he targeted?  Did he have a specific type that he

12   targeted?

13   A.    He did.  He said that he prefers as young as eight

14   years old.

15   Q.    So eight was his limit?

16   A.    Correct.

17   Q.    You stated that he sent explicit photos of himself.

18   Did he state that he asked for photos back?

19   A.    On occasions.

20   Q.    And did he receive any of those photos?

21   A.    I don't recall.

22   Q.    Did he talk about the child sexual abuse materials

23   found on his phone at all?

24   A.    Briefly.  We -- the question was posed to Mr. James

25   based upon the what I would define as elevated conversation

1    that he was having which started kind of vanilla and then

2    became more aggressive in his communications with the

3    individuals in the chats.

4         We asked Mr. James if he had continued to communicate

5    with the minors online, if he would have ended up traveling

6    to meet with any minors, for which he stated that had we not

7    come and talked to him, he probably would have escalated to

8    hands-on offenses?

9    Q.   Did he tell you where he got the child sex abuse

10   materials?

11   A.   He mentioned a few different platforms, one of which

12   was Whisper.  The other one was Telegram.

13        He would go onto these platforms and specifically seek

14   out what are referred to as MEGA links.  Those links

15   contained CSAM, and would obtain it that way, but stated

16   that he never distributed any.  He would just purchase it

17   via CashApp and just would keep it for himself.

18   Q.   And when you stated some of the images that you

19   reviewed, or you and your agency reviewed, were infants,

20   what does infants mean to you?

21   A.   Generally I think that that would vary depending on

22   who the reviewer is, but one or less.

23   Q.   And some of the photos and videos that were on his

24   phone included infants?

25   A.   Correct.

1   Q.   And where did you -- where was he living when you

2   found him?

3   A.   He was living in his parents' residence.

4   Q.   And this is the same IP address that came back to his

5   parents?

6   A.   That's correct.

7           MS. SCHNELLINGER:  Your Honor, I have nothing

8   further for this witness.

9           THE COURT:  Cross-examination, Mr. Bryan.

10          MR. BRYAN:  Thank you, Your Honor.

11            CROSS-EXAMINATION OF AUSTIN JOHNSTON

12  BY MR. BRYAN:

13  Q.   Good morning, still, Special Agent Johnston.

14  A.   Good morning.

15  Q.   You were part of this Child Exploitation Task Force?

16  A.   I'm not listed under the Child Exploitation Task

17  Force.  I assist them.  I'm listed with the Violent Crimes

18  Safe Streets Task Force.

19  Q.   Okay.  So you're on the Safe Streets Task Force, but

20  you will assist in these child exploitation cases?

21  A.   Correct.

22  Q.   And how long have you been with the FBI?

23  A.   Approximately five years.

24  Q.   Okay.  And have you been doing that for that period of

25  time?

1    A.    I have.

2    Q.    So you've been doing safe violent streets and

3    assisting in child exploitation cases?

4    A.    Correct.

5    Q.    So you've been involved in investigations

6    where -- either you've personally been involved in or you've

7    heard of investigations where persons have contacted minors

8    online and did in fact meet up with the minors, correct?

9    A.    Correct.

10   Q.    Are you familiar with those cases?

11   A.    I am.

12   Q.    That didn't happen in this case, correct?

13   A.    Not that I'm aware.

14   Q.    Not that you're aware.

15         Your first knowledge of this I guess it was somebody

16   calling themselves Ambient_Sun on the Whisper app was on

17   June 13, 2024, correct?

18   A.    Correct.

19   Q.    And that's when an undercover task force officer -- I

20   don't know if it was FBI or a local officer acting in an

21   undercover capacity -- posted online that they were so much

22   in trouble because their parents, when they found out that

23   she was pregnant?

24   A.    Correct.

25   Q.    So that person was not an actual minor, correct?

1  A.    Correct.

2  Q.    It was an adult law enforcement officer pretending to

3  be a minor?

4  A.    Correct.

5  Q.    On this app that is known to be visited by persons who

6  are interested in minors?

7  A.    I'm not familiar with the extent of the Whisper app.

8  But yes, the OCE is not a eleven-year-old female.

9  Q.    Okay.  The OCE is an adult.  I think it says in the

10  affidavit a male, right?

11  A.    Correct, yeah.  He is a special agent out of Toledo,

12  Ohio.

13  Q.    So an FBI agent from Toledo, Ohio?

14  A.    Correct.

15  Q.    And so we've seen Government's Exhibit 1.  It's been

16  proffered to the Court.

17        And it's basically a chat between Ambient_Sun and this

18  person posing to be an eleven-year-old girl; correct?

19  A.    Correct.

20  Q.    It begins with the -- well, strike that.

21        This isn't the entire chat, correct?

22  A.    My belief is that this is the entire chat.

23  Q.    Okay.  Do you know if all of the statements made by

24  the OCE are included in this FBI 302?

25  A.    By statements, do you mean messages in response to Mr.

1   James?

2   Q.   Well, there are "OCE" and then there are "Subject."  I

3   assume that the OCE is the FBI agent, correct?

4   A.   That's correct.

5   Q.   And the Subject at the time was a person that was only

6   identified as Ambient_Sun, correct?

7   A.   At the time, correct.

8   Q.   Later to be identified as Mr. James, correct?

9   A.   Correct.

10  Q.   So that person -- it basically begins with that

11  person -- I guess the summary says that they went on and

12  said, "Oh, my God.  My parents are going to kill me when

13  they find out I'm pregnant."

14       Then shortly after that, Ambient_Sun -- well, it says

15  "Subject:  How old are you?"  So that would be Ambient_Sun,

16  correct?

17  A.   That's correct.

18  Q.   And then the OCE said, "Eleven"?

19  A.   Correct.

20  Q.   And then it goes on and it talks about having sex with

21  the eleven year old and having painful sex with the eleven

22  year old and all those other things, correct?

23  A.   Correct.

24  Q.   And only rarely are there interactions -- or

25  statements made by the OCE, correct?

1    A.    Correct.

2    Q.    And then there is a lot of dot, dot, dot, dot, dot;

3    correct?

4    A.    Correct.

5    Q.    Do you know if those are statements that were made by

6    the OCE that aren't part of Exhibit 1?

7    A.    I don't know.

8    Q.    Okay.  So is it possible that there are other

9    statements in the chat that aren't -- that weren't made

10   as -- that aren't on Government's Exhibit 1?

11   A.    That's possible.

12   Q.    Okay.  Because it seems like most of the statements

13   are made by the subject, right?

14   A.    Correct.

15   Q.    And I think the OCE only on one occasion says -- on a

16   couple of occasions says, "OMG."

17         One time says, "Will it hurt?"

18         "OMG, it will hurt."

19         You know, that kind of thing.

20         But we don't know exactly what the OCE is saying

21   on other occasions or if the OCE is saying anything else,

22   correct?

23   A.    Correct.

24   Q.    Now, you're aware of undercover investigations that

25   have actually continued to maintain their undercover

1    capacity where they then set up a meeting with the targeted

2    individual, correct?

3    A.    Correct.

4    Q.    And that wasn't done in this case, correct?

5    A.    That's correct.

6    Q.    So it wouldn't have been uncommon for law enforcement

7    to continue to maintain online communication with the target

8    to the point where they actually gave the target an address

9    to meet them at; correct?

10   A.    Sometimes.

11   Q.    But you've seen that happen?

12   A.    I have seen that.

13   Q.    Okay.  That's done in some instances to make sure that

14   people aren't just goofing off online, correct?

15   A.    I can't -- that would be an assumption.

16   Q.    Well, that they really mean it, rather than -- have

17   you heard of fantasy role-play?

18   A.    I have.

19   Q.    So sometimes people go online and they pretend to be

20   something that they're really not?

21   A.    Um-hum.

22   Q.    And they engage in activity online and say a lot of

23   very offensive things online, but they never actually do

24   anything?

25   A.    I've heard of that.

1    Q.    And sometimes they may even do it for masturbatory

2    reasons or things like that?

3    A.    I'm not familiar with it.

4    Q.    But to determine whether or not someone's really

5    interested in hooking up with an eleven year old and effing

6    their brains out, you would actually have to set up a sting

7    operation where you see if that person shows up at a

8    residence or at an address that they think they're going to

9    meet the eleven year old at, correct?

10    A.    Correct.

11    Q.    Okay.  And that wasn't done in this case, correct?

12    A.    Correct.

13    Q.    So we don't know whether or not the person, the

14    subject, was just engaging in what I would call fantasy

15    role-play as compared to really trying to groom somebody to

16    target them in sexual offenses, right?

17    A.    I can't say.

18    Q.    You can't say.

19    But it is concerning enough that you did -- they asked

20    you, since you were in the Canton area, to go out and, once

21    they located the IP address for where this person was

22    communicating, to contact that person or at least to locate

23    that person?

24    A.    Correct.

25    Q.    And that was done on July 1, I believe?

1   A.   I believe so.

2   Q.   And that's what the affidavit says, I believe?

3   A.   Yes.

4   Q.   And you were present at that time?

5   A.   Yes, sir.

6   Q.   How many law enforcement officers were present?

7   A.   Just two.

8   Q.   Yourself and one of the task force officers?

9   A.   That's correct.

10  Q.   And you met Mr. James at his home?

11  A.   I did.

12  Q.   Were his parents at the home at the time?

13  A.   They were not.

14  Q.   He was there alone?

15  A.   Correct.

16  Q.   Would it be fair for me to say that he was cooperative

17  when you interviewed him?

18  A.   Yes.

19  Q.   That he wasn't trying to be evasive?

20  A.   I wouldn't say that.

21  Q.   Well, I mean, he was concerned that the FBI showed up

22  at his house, correct?

23  A.   Yeah.

24  Q.   Was this a situation where you felt it necessary to

25  Mirandize him, or you did not Mirandize him because he

1    wasn't in custody?

2    A.    He was free to leave and free to stop the interview at

3    any time.  So no Miranda was needed.

4    Q.    There was no formal Miranda warning at the time?

5    A.    No.

6    Q.    But he knew you were FBI and that the other officer

7    was a task force officer with the FBI?

8    A.    Correct.

9    Q.    You told him that you were there to talk to him about

10   something that happened online?

11   A.    Correct.

12   Q.    And you explained to him basically what we learned

13   about in Government's Exhibit 1?

14   A.    Sorry, which was?

15   Q.    The chat between the undercover and Ambient_Sun?

16   A.    Correct.  We didn't go into detail, but that was the

17   nature of the interview.

18   Q.    And Mr. James was cooperative and didn't deny that he

19   was Ambient_Sun or anything like that?

20   A.    He stated that he didn't recall the specific

21   conversation.

22   Q.    Okay.  But he didn't deny it either?

23   A.    Correct.

24   Q.    Okay.  And at that time you assessed the situation and

25   you left?

1  A.   At that time his --

2  Q.   Strike that.  Let me back up a little.

3       You did further investigation, correct?

4  A.   After we left, correct.

5  Q.   Okay.  But he also, while you were there, he gave you

6  access to his phone?

7  A.   That's correct.

8  Q.   He gave you permission to look at his phone, correct?

9  A.   Correct.

10  Q.   And did you have like a mobile, like forensic unit

11  that could look at his phone in more detail?

12  A.   On scene?

13  Q.   On scene.

14  A.   No.

15  Q.   Okay.  Did you have any tools that you were able to

16  use to look at his phone in greater detail?

17  A.   No, not when we were at his property.

18  Q.   Okay.  It says in the affidavit that you noticed on

19  the property that there was child exploitive materials on

20  his phone?

21  A.   Correct.  We asked him about the applications that he

22  was using to access that material.  He showed us those

23  applications.

24       And then on those applications we could view what

25  appeared to be child sexual abuse material.

1    Q.    But you weren't able to count it or anything at that

2    time?

3    A.    No.  We confirmed that there was material on there.

4    And then due to the fact that we didn't have a forensics

5    team and it takes a long time to image a phone, we had

6    consent to take that phone and image it.

7    Q.    Okay.  So without a warrant, he gave you consent to

8    take his phone?

9    A.    That's correct.

10    Q.    Okay.  And you took his phone and went back to the

11    office?

12    A.    Correct.  The phone was taken back and imaged.

13    Q.    Okay.  And so you got a -- you did forensics on it and

14    got an image from the phone, basically a copy of what was on

15    the phone?

16    A.    Correct.

17    Q.    So that you could examine it for forensic purposes?

18    A.    That's correct.

19    Q.    Okay.  The phone wasn't returned, I presume?

20    A.    No.

21    Q.    That's because it contained contraband on it?

22    A.    Correct.

23    Q.    So you continue to possess the phone until -- I guess

24    you still have the phone?

25    A.    Correct.  Once the image is done, it's generally, the

1   phone itself is sent to evidence where it sits.

2   Q.   So it's sitting in your evidence locker somewhere?

3   A.   Correct.

4   Q.   And so then you did do a complete forensic examination

5   of the phone?

6   A.   One was done, yes.

7   Q.   One was done.  And then that's where we come up with

8   the 700-and-some images of CSAM?

9   A.   Files, correct.

10  Q.   Files of CSAM.  And some of those are pictures and

11  some of those are videos?

12  A.   Correct.

13  Q.   Did you find the chats from Whisper?

14  A.   Are you asking if the chats were on the phone?

15  Q.   Were the chats on the phone, yes.

16  A.   I did not review that particular device, so I can't

17  say.

18  Q.   Okay.  Were there other devices that were ultimately

19  taken from --

20  A.   No, there was just the one device, but that initial

21  review is done by our task force officer.

22  Q.   Okay.  So ultimately -- so this is in early July,

23  correct?

24  A.   Correct.

25  Q.   So ultimately you decided to swear out a criminal

1  complaint and then arrest Mr. James, correct?

2  A.    Correct.

3  Q.    And that occurred earlier this week?

4  A.    Correct.

5  Q.    So this interview occurred on July 1?

6  A.    Um-hum.

7  Q.    And then the decision to arrest Mr. James occurred

8  earlier this week?

9  A.    No.

10  Q.    When was the decision made to get an arrest warrant

11  for Mr. James?

12  A.    Well, the decision to want to arrest Mr. James was on

13  July 1, but unfortunately there is a process that has to be

14  taken in order to do that.

15  Q.    You didn't -- just based upon what Mr. James admitted

16  to at that time and also the fact that you saw that he had

17  child pornography on his phone, are you saying you didn't

18  have the authority to arrest him at that time?

19  A.    I don't think it's good practice to, without giving

20  the due diligence to completely review his material, to make

21  that determination.

22  Q.    Okay.  But if you were concerned about the safety of

23  the community, you had the authority to arrest Mr. James on

24  July 1, correct?

25  A.    We do have that authority, yes.

1    Q.    And you could have sworn out a complaint just based

2    upon that information that you had at that time, correct?

3    A.    We could have typed one.

4    Q.    Right.  And he could have had an initial appearance in

5    court on around July 2 based upon the criminal complaint?

6    A.    We could type up the information we have as

7    investigators, but we don't make the ultimate determination

8    as to whether or not --

9    Q.    That would be the United States Attorney's Office,

10    correct?

11    A.    That's correct.

12    Q.    So you'd have to interact with the U.S. attorney in

13    the case?

14    A.    That's correct.

15    Q.    But if law enforcement had a concern that somebody was

16    an imminent threat to the community, they wouldn't have let

17    him remain in the community.  They would arrest him,

18    correct?

19    A.    Presumably.

20    Q.    So there was something about your interactions with

21    Mr. James that you didn't feel that it was important to

22    arrest him immediately on July 1, correct?

23    A.    Um --

24    Q.    Well, you didn't arrest him on July 1, correct?

25    A.    That's correct.

1 Q. You had the authority to arrest him on July 1,

2 correct?

3 A. Yes, sir.

4 Q. You had the authority to arrest him at any time

5 between July 1 to September 3, correct?

6 A. Correct.

7 Q. And he wasn't arrested until September 3?

8 A. Correct.

9 Q. So when he was arrested, again, Mr. James, would you

10 characterize his demeanor with you as cooperative?

11 A. He was.

12 Q. Do you remember him telling you that you didn't have

13 to even come get him, that he would have came and turned

14 himself in if you'd just called him up and said there was a

15 warrant for him?

16 A. He did say that.

17 Q. So he didn't appear to be anyone who wanted to flee?

18 Or he didn't show any evidence of a propensity to be fleeing

19 at that time?

20 A. Not at that time.

21 Q. And then I assume now since he was under arrest when

22 you interviewed him the second time, you advised him of his

23 rights?

24 A. We did.

25 Q. Okay.  And he waived his rights and agreed to talk to

1    you without an attorney?

2    A.    That's correct.

3    Q.    And it was during this back and forth that he admitted

4    to you that he had at least communicated with people online

5    who purported themselves to be minors, correct?

6    A.    Correct.

7    Q.    But he never met with any of those people in person,

8    correct?

9    A.    I don't know.

10   Q.    Well, he never told you he met with any of those

11   people in person, correct?

12   A.    That's what he said.

13   Q.    And your investigation has not determined that he has

14   met with anybody in person, correct?

15   A.    Correct.

16   Q.    Okay.  And again, now, you've had his phone for quite

17   some time.  Have you been able to find chat logs between Mr.

18   James and other individuals?

19   A.    From my understanding, there were additional chat

20   logs, but some were -- had been removed since we seized the

21   phone.

22   Q.    Okay.  But when you forensically examine a phone, you

23   have the ability to recover information that's been deleted?

24   A.    Certain information is saved to the phone, but on

25   applications like that, especially if they're cloud based,

1    then no.

2    Q.    Okay.  So you didn't have sufficient evidence to try

3    to find any of the persons that he may have chatted with?

4    A.    The investigation is ongoing.

5    Q.    So the investigation is ongoing.

6          All right.  So you have no evidence that Mr. James

7    actually met with anyone in person, correct?

8    A.    No.

9    Q.    And according to him, he said he never met with anyone

10   in person, correct?

11   A.    Correct.

12   Q.    And, but you also said that he made statements to the

13   effect, "Well, gee, if you guys didn't get me, you know I

14   probably could have met with someone or was close to meeting

15   with someone," right?

16   A.    He said that if we didn't meet with -- if we didn't

17   make contact with him, he probably would have met with

18   somebody.

19   Q.    And that was him in basically cooperation mode with

20   the FBI, correct?

21   A.    Correct.

22   Q.    Is this interview audiotaped and videotaped in any

23   way?

24   A.    Audio and video.

25   Q.    There is audio and video of this interview.

1          All right.  Thank you.

2          You said that during this he admitted to having chats

3     with other minors or people portraying themselves as minors,

4     you said two to ten times?

5     A.    That was what Mr. James stated.

6     Q.    Okay.  Would you agree with me there is a big

7     difference between two and ten?

8     A.    No.

9     Q.    Okay.  So you don't think that's a wide variation?

10    A.    No.

11    Q.    And other stuff that you found on the phone involved

12    these pictures of coworkers because apparently he used to

13    work at a McDonald's?

14    A.    I believe he still does -- or excuse me.

15    Q.    He works at Taco Bell.

16    A.    Taco Bell.

17          Yes, Mr. James stated he used to work at McDonald's.

18    Q.    Okay.  You said they were coworkers.  Female

19    coworkers?

20    A.    Correct.

21    Q.    You indicated that he used AI to undress them?

22    A.    Correct.

23    Q.    As inappropriate as that sounds, that's not unlawful,

24    correct?

25    A.    It is unlawful.

1  Q.    It is unlawful now?

2  A.    Depending on the age of the individuals.

3  Q.    Okay.  All right.  So the individuals were female

4  workers at McDonald's?

5  A.    Correct.

6  Q.    Did you identify the workers themselves?

7  A.    At the time -- at this time, no.  The investigation is

8  still ongoing.

9  Q.    And so some of them maybe appeared to be underage or

10  teenagers?

11  A.    He stated that they were minors.

12  Q.    He stated that they were minors, okay.

13        But if they were working at McDonald's, they weren't

14  eleven or twelve years old, correct?

15  A.    Not -- likely not eleven or twelve.

16  Q.    They were likely sixteen or older?

17  A.    If they were minors, I would say sixteen to seventeen.

18  Q.    And he also explained to you how he was able to gain

19  access to the CSAM material, too, correct?

20  A.    Correct.

21  Q.    And it was through these same apps, Telegram and

22  Whisper?

23  A.    Correct.

24  Q.    And these are applications that are allowed to be in

25  service online as we speak today?

1  A.    Unfortunately.

2  Q.    So they're not -- they haven't been taken down or

3  anything like that?

4  A.    No.

5  Q.    I guess, wasn't the creator of Telegram arrested in

6  France or something recently?

7  A.    Probably.

8  Q.    But again, the apps themselves aren't considered

9  contraband or illegal themselves?

10  A.    No.

11  Q.    In these images, you described adults having sex with

12  prepubescent minors.  And you also said -- you described

13  adults having sexual conduct with what appeared to be

14  infants?

15  A.    Correct.

16  Q.    And that was within this 749 images?

17  A.    Within the 764, correct.

18  Q.    The 764.

19        And those images varied from the infants to

20  adult -- well, I guess if it's CSAM is all minor related.

21  A.    Correct.  I mean -- excuse me.  Of the 764 files, all

22  of those would be consistent -- or excuse me, considered

23  child sexual abuse material.

24  Q.    All right.  So anyone under eighteen?

25  A.    Correct.

1          MR. BRYAN:  Nothing further, Your Honor.

2          THE COURT:  Thank you.

3       Redirect?

4          MS. SCHNELLINGER:  Just briefly, Your Honor.

5          REDIRECT EXAMINATION OF AUSTIN JOHNSTON

6    BY MS. SCHNELLINGER:

7    Q.   Based on the chats and your experience and training,

8    who did the defendant believe he was talking to when he was

9    talking to an online covert employee in June?

10   A.   A eleven-year-old female.

11   Q.   And he sent that eleven-year-old female pictures of

12   his penis?

13   A.   Correct.

14   Q.   And he admitted that he has done that before when he

15   was talking to minors?

16   A.   Correct.

17   Q.   And he specifically stated to you that he would have

18   met with the child to do the things that he described in the

19   chats if you hadn't intervened?

20   A.   Correct.

21          MS. SCHNELLINGER:  Nothing further, Your Honor.

22   Thank you.

23          THE COURT:  All right.

24       Any recross?

25          MR. BRYAN:  No, Your Honor.  Thank you.

1          THE COURT:  Thank you very much, Special Agent

2     Johnston.  You're excused.

3          (Witness excused.)

4          THE COURT:  Ms. Schnellinger, is there any

5     further evidence or proffer from the government?

6          MS. SCHNELLINGER:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Thank you.

8       Mr. Bryan.

9          MR. BRYAN:  Your Honor, we, too, would proffer

10     the pretrial services report.

11          And I would also proffer for the record that present

12     in court today is Heather James, Mr. James' mother, that I

13     spoke with her prior to the proceedings today and she

14     indicated, as is I think made clear in the pretrial services

15     report, that Mr. James is permitted to live in his home with

16     whatever conditions -- or in her home and her husband's

17     home, with whatever conditions the Court deems appropriate

18     during the pendency of this matter.  So he does have a

19     stable residence to stay at with the permission of his

20     parents.

21          THE COURT:  Thank you.

22          All right.  I know that our pretrial services officers

23     work under strict time pressures, and so I always do like to

24     check in before we move to argument to see if there is any

25     further information or recommendations from pretrial

1    services.

2              THE PRETRIAL SERVICES OFFICER:  No, Your Honor.

3    Nothing further.

4              THE COURT:  Thank you.

5         All right.  The Court is now prepared to hear argument

6    from the parties which should specifically address the

7    detention factors under 18 U.S.C. 3142(g).

8              Ms. Schnellinger, you may proceed with argument.

9              MS. SCHNELLINGER:  Thank you, Your Honor.

10        I think this Court has a decent idea of the nature and

11   circumstances of this specific offense.

12        I will highlight the fact that this is a very

13   vulnerable community that he is targeting, specifically

14   children as young as eight years old.  Not to mention the

15   fact that the child sex abuse material that was recovered

16   involved infants and involved sadistic child sex abuse

17   material as well.

18        So we have not only the victimization of the children

19   that are involved in the child sex abuse material but also

20   his activities online.

21        He, in the chats that we have and that I presented to

22   the Court, he was -- believed that he was talking to an

23   eleven-year-old girl.  He was not under any delusion that it

24   wasn't.

25        And he also admitted that he has done this before and

1    that these were minors.

2         We don't have any indication that these were all

3    undercover officers.  We have one undercover officer.  And

4    all the rest were minors based on his own statement.

5         And again, his target group was eight years old, and

6    older, and that he would ask these minors for nude photos of

7    themselves.

8         I think most importantly to point out the nature and

9    circumstances of this case is that he specifically stated he

10   was escalating.

11        He started with conversations, and he didn't meet with

12   anybody but he fully admitted that he was escalating to the

13   point that he was going to attempt to meet with a child and

14   victimize our most vulnerable members of our society.

15        And he's described what he would do to that child in

16   Government's Exhibit 1.

17        I think the weight of the evidence for detention is

18   great.  Again, he did this in his parents' home.  He not

19   only victimized children while he was online, he reached out

20   to children even when he was working.

21        I realize that he took normal pictures of minors, but

22   then he victimized them in his own home by turning them into

23   nude pictures of these same individuals and then using them

24   for his own sexual gratification.

25        So even children in the community that are just

1   working, he made them victims.

2           So you add all that together, I think the weight of

3   the evidence is great.

4           I recognize that he has a stable residence with his

5   parents and that he is employed.  But again, all this

6   happened when he was in that stable residence.  All this

7   happened when his parents were present.  And some of this

8   happened when he was employed.  So I think that the history

9   and characteristics, which may be positive in some cases,

10  are negative in this case.

11          And I will point out that it seems like his mom, based

12  on the pretrial services report, was unaware of a lot of the

13  things that were going on with this particular defendant, if

14  you read through the mental health assessment and obviously

15  his activities.

16          I think overall, Your Honor, that the main factor to

17  focus on is the nature and circumstances and the

18  vulnerability of the victims in this case.

19          He did this in his own home.  He did this with his

20  parents -- living with his parents.  And I don't know what

21  conditions this Court could put in place.

22          I realize that the Court can put a bracelet on him or

23  monitor him and make sure he's not on the computer.  But he

24  was using legal applications to do this.  He was utilizing

25  victims that were just in the community working.  And he was

1  able to victimize them, and they were unaware of this.

2       So I don't know how the Court could put any restraints

3  on him in the community that can prevent this individual

4  from finding an eight-year-old child.  And that danger is so

5  great to that vulnerable, as I keep saying, that vulnerable

6  member of our community.

7       If he decides to just walk out the door, we're not

8  going to be able to stop him.  And I think the danger that

9  he poses is too great to release him.

10      Thank you.

11           THE COURT:  Thank you.

12      Mr. Bryan.

13           MR. BRYAN:  Yes, Your Honor.

14      As it relates to the issue of detention, the Court has

15  to determine, first of all, whether or not the presumption

16  in favor of detention has been rebutted.

17      I would submit to the Court that the pretrial services

18  report itself presents significant evidence to rebut the

19  presumption in favor of detention.

20      In addition to that, the proffer regarding his

21  mother's willingness along with his father, who couldn't be

22  here today, to allow him to remain in their home and stay in

23  their home with whatever conditions the Court deems

24  appropriate would also rebut the presumption in favor of

25  detention.

1  So then the issue then becomes whether or not, by the

2  weight of the evidence, whether or not Mr. James is a flight

3  risk, or by clear and convincing evidence whether he is a

4  danger to the community.

5  I don't know that the government is arguing flight

6  risk.  I believe that the government's stronger argument, or

7  the one that they're emphasizing more -- I'm not suggesting

8  that I believe their argument for danger is stronger, but

9  the one they seem to be emphasizing is as it relates to

10  danger to the community.

11  The government seems to believe that there aren't any

12  conditions sufficient to be able to warrant the Court's

13  peace of mind that Mr. James would not engage in the types

14  of conduct that appear to be taking place based upon the

15  allegations in this case.

16  I think it is important to point out that there is no

17  evidence that Mr. James actually met with anyone in person.

18  And that is because of the nature of the internet, that a

19  lot of things take place out of the privacy of people's

20  homes that they would never do or never act upon outside of

21  their home, meaning they can, while they're sitting at home

22  in their own bedroom, while they're chatting with somebody

23  online, they can act like anything, frankly, that they want

24  to be.  No matter how horrific it may sound, they can act

25  that way.  They can speak that way.  But there is no

1   evidence whatsoever that Mr. James would have ever acted the

2   way that the Government's Exhibit 1 indicates.

3       So that's why I brought up fantasy role-playing as it

4   relates to how people may engage online as compared to in

5   real life.

6       And I think it is important, the nature and quality of

7   the investigation is important.  If you target -- if you see

8   someone like this and you have a concern about someone like

9   this, I'm not sure why law enforcement didn't play it out,

10  why they didn't continue to communicate with Ambient_Sun

11  over the internet and eventually set up a meet a date and

12  time.

13      I've represented multiple people throughout my last 27

14  years in federal court who came into court the morning after

15  they were arrested by the task force because they showed up

16  somewhere.  They came from across state lines and they

17  showed up in a hotel where they thought they were going meet

18  a minor.  Or they showed up at a residence where they

19  thought they were going to meet a minor.

20      And law enforcement carried out the hoax, the

21  undercover activity, up until the point where they could see

22  whether or not this person was just engaging in all talk

23  online or fantasy role-play online, or if they really were

24  somebody who is an actual threat to carry out the types of

25  things that they were -- that they would say online but

1   would never do in real life.

2       And those clients, frankly, were arrested in very

3   compromising situations.  Some of them had brought gifts to

4   the children that they believed that they were going to

5   meet, the children that they had a series of chats with over

6   a period of time, with that person that was not a real child

7   but was an undercover law enforcement officer.  Sometimes

8   they acted as the mother of the child that they -- the

9   mother was trying to sell the child for sex and things of

10  that nature.  Sometimes they acted as the child themselves.

11      And those things were carried out to fruition so they

12  could really remove someone from the street who was really a

13  threat and danger to the community, someone who really was

14  going to act upon something rather than just engage in

15  fantasy.

16      And so what I think the evidence suggests at most in

17  this case -- and I don't think you can sort of jump to

18  conclusions above and beyond that -- what the evidence

19  suggests at most in this case is somebody who is engaging in

20  fantasy and not somebody who was intending to carry out in

21  real life interactions with children because there is zero

22  evidence that Mr. James did engage in activity with

23  children.  And I believe there is zero evidence that he

24  would have.

25      I think all the evidence suggests is that he was

1    somebody who was engaging in clearly not only inappropriate

2    behavior but the allegations being very concerning behavior

3    over the internet.

4         So, but does that mean that with the conditions and

5    combinations of conditions that this Court can impose, that

6    he continues to be a threat to the community?  I would

7    submit to the Court that it doesn't.

8         I think it's also relevant that law enforcement had

9    the authority to arrest Mr. James on July 2.  And I'm not

10   just talking about the FBI and the local task force.

11   However, they work in concert with the U.S. Attorney's

12   Office.  The U.S. attorney is now saying, "This is horrible.

13   He's is going to do this.  He's going to carry this out."

14        But for over two months nobody acted with any alacrity

15   whatsoever to arrest Mr. James and make sure that he didn't

16   really act on any of this stuff.

17        And I think they did that.  I think they made an

18   assessment, I think law enforcement made an assessment when

19   they met with Mr. James, probably because of his cooperative

20   nature and his -- and also looking at his background, that

21   he had emotional issues and was struggling with a lot of

22   mental health issues, that he wasn't a true threat to the

23   community.  And so that's why they didn't act immediately.

24        If they believed he was a threat to the community on

25   July 2 and they have this chat log on July 2, they would

1  have arrested him then and there.

2       I don't believe the FBI or the U.S. Attorney's Office

3  would allow someone to remain in the community for another

4  two months if they really believed that they were a threat,

5  a real threat to the community, as compared to somebody who

6  is engaged in, allegedly engaged in fantasy behavior as

7  compared to actually going and carrying it out.

8       And I believe that's why pretrial services makes the

9  recommendation it does, because they had an opportunity to

10  not only meet with Mr. James but also meet with his parents

11  and discuss Mr. James with his parents.

12       He's clearly been struggling since he went to college

13  and had some emotional -- he had an emotional breakdown.

14  There was an attempted suicide attempt with medication.

15  He's been in mental health treatment.

16       All of these are things that he and his family have

17  done on their own.  They weren't forced to do it by any

18  court.  So they're acting responsibly.

19       There is a young man that's struggling emotionally,

20  that's struggling with his mental health, and they're acting

21  responsibly.  He's getting the mental health treatment that

22  he needs in the community.  And he's continuing with that.

23  To this day he continues to see mental health professionals

24  even without it being a condition from the Court, which

25  obviously this Court can make it a condition.

1    But to this day, he and his family began long before

2    this case began intervening in his life with mental health

3    professionals.  And he has continued to meet with mental

4    health professionals to this very day.

5    So there is a stability there that I think the Court

6    can look to see also that there is not clear and convincing

7    evidence that this particular defendant, notwithstanding the

8    serious sounding nature of these chat logs, that he is a

9    true threat, a real threat to the community, especially with

10   the conditions that Your Honor can impose and that are

11   recommended by the pretrial services office.

12   Thank you.

13   THE COURT:  Thank you.

14   Mr. James, as I previously stated, the issues for

15   determination today are first whether you have met your

16   burden of production to rebut the presumption under 18

17   U.S.C. 3142(e)(3) that no condition or combination of

18   conditions will reasonably assure the appearance of the

19   person as required and the safety of the community, and if

20   you have met your burden, whether there is a condition or a

21   combination of conditions that will reasonably assure the

22   safety of others and the community and your appearance in

23   the case.

24   To sustain detention, the government must establish

25   either by clear and convincing evidence that no condition or

1     combination of conditions will reasonably assure the safety

2     of other persons and the community or by a preponderance of

3     the evidence that no condition or combination of conditions

4     will reasonably assure your appearance.

5          In determining whether there are conditions of release

6     that will reasonably assure your appearance as required and

7     the safety of others and the community, the Court must take

8     into account the available information regarding the

9     following factors:

10          First, the Court must consider the nature and the

11     circumstances of the offense charged, including whether that

12     offense involves minors.

13          Second, the Court must consider the weight of the

14     evidence against the defendant.  Now, that is the weight of

15     the evidence as to dangerousness or risk of flight.  Not the

16     weight of the evidence as to guilt.

17          The third factor is the history and characteristics of

18     the defendant.  That includes the character, physical and

19     mental condition, family ties, employment, financial

20     resources, length of residence in the community, community

21     ties, past conduct, history relating to drug or alcohol

22     abuse, criminal history, and the record concerning

23     appearances at prior court proceedings.

24          The Court must consider also whether at the time of

25     the current offense or arrest the defendant was on

1    probation, parole, or any other form of release.

2         The final factor is the nature and the seriousness of

3    the danger to any person or the community that would be

4    posed by the person's release.

5         As I indicated earlier, at no time do any of these

6    factors affect the presumption of innocence that applies in

7    all criminal cases.

8         The Court will take the detention determination under

9    advisement and will promptly issue a written ruling.

10        Mr. James will remain in the custody of the United

11   States marshal pending the Court's decision in the matter.

12        At this time, Ms. Schnellinger, is there anything

13   further on behalf of the United States?

14             MS. SCHNELLINGER:  No, Your Honor.  Thank you.

15             THE COURT:  Mr. Bryan, anything further for the

16   defense?

17             MR. BRYAN:  No.  Thank you, Your Honor.

18             THE COURT:  All right.  Thank you, all.  We're

19   adjourned.

20        (Proceedings concluded at 12:34 p.m.)

21

22

23

24

25

1              I N D E X

2

3   DIRECT EXAMINATION OF AUSTIN JOHNSTON        7

4   BY MS. SCHNELLINGER

5   CROSS-EXAMINATION OF AUSTIN JOHNSTON        16

6   BY MR. BRYAN

7   REDIRECT EXAMINATION OF AUSTIN JOHNSTON      36

8   BY MS. SCHNELLINGER

9

10

11           C E R T I F I C A T E

12

13        I certify that the forgoing is a correct

14 transcript, to the best of my ability, transcribed from a

15 digital audio recording from the record of proceedings in

16 the above-entitled matter.

17

18        S/Caroline Mahnke        12/6/2024

19        Caroline Mahnke, RMR, CRR, CRC    Date

20

21

22

23

24

25