```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3      UNITED STATES OF AMERICA,        Case No. 5:24-cr-0341-BMB-1
                                         Cleveland, Ohio
 4                 Plaintiff,            Tuesday, January 14, 2025
                                         9:06 a.m.
 5           vs.

 6      MICHAEL MONROE JAMES,

 7                 Defendant.

 8
                TRANSCRIPT OF MOTION TO SUPPRESS PROCEEDINGS
 9             BEFORE THE HONORABLE BRIDGET M. BRENNAN,
                      UNITED STATES DISTRICT JUDGE
10

11      APPEARANCES:

12      For the Government:       For the Government:
                                  Toni B. Schnellinger Feisthamel
13                                Assistant United States Attorney
                                  208 Federal Building
14                                2 South Main Street
                                  Akron, Ohio    44308
15                                330-761-0531

16      For the Defendant:        Edward G. Bryan
                                  Assistant Federal Public Defender
17                                1660 W. 2nd Street, Ste. 750
                                  Cleveland, Ohio    44113
18                                216-522-4856

19

20

21      Official Court Reporter:  Heidi Blueskye Geizer,
                                  Certified Realtime Reporter
22                                United States District Court
                                  801 West Superior Avenue
23                                Cleveland, Ohio    44113
                                  216-357-7092
24

25      Proceedings recorded by mechanical stenography, transcript
        produced by computer-aided transcription.
```

1       MORNING SESSION, TUESDAY, JANUARY 14, 2025 9:06 A.M.

2                    THE COURT:  We are here this morning for a

3       suppression hearing in United States of America versus

4       Michael Monroe James, Case Number 5:24-cr-341.

5            Will counsel for the government please state your

6       appearance, and also identify who is with you at counsel

7       table.

8                    MS. SCHNELLINGER:  Good morning, Your Honor.

9       Toni Beth Schnellinger for the United States.  I am joined

10      at counsel table by FBI TFO Katy Jarvis and Special Agent

11      from the FBI Austin Johnston.

12                   THE COURT:  Thank you.  Good morning to you

13      both.

14           And on behalf of the defendant.

15                   MR. BRYAN:  Good morning, Your Honor.  Edward

16      Bryan on behalf of Michael James, and with me at counsel

17      table is Attorney Aleesha Kazi.

18                   THE COURT:  Thank you.  Good morning.

19           Good morning, Mr. James.

20                   THE DEFENDANT:  Good morning, Your Honor.

21                   THE COURT:  The motion to suppress involves

22      statements made on July 1, 2024, as well as the contents of

23      a cellular telephone.  The arguments are laid out in

24      document number 18.  The Government responded in opposition,

25      that's document number 24, and the defendant replied in

1   support, that's document 25.

2        Before we go any further, how many witnesses does the

3   government anticipate calling?

4              MS. SCHNELLINGER:  I only anticipate calling

5   one at this point, Your Honor.

6              THE COURT:  Thank you.  And does the defense

7   anticipate any witnesses?

8              MR. BRYAN:  One additional witness

9   potentially, yes, Your Honor.

10             THE COURT:  With that, are there any other

11  matters to address or statements to make before the Court

12  begins hearing testimony?

13       On behalf of the government?

14             MS. SCHNELLINGER:  No, Your Honor.  Thank you.

15             THE COURT:  Mr. Bryan?

16             MR. BRYAN:  No, Judge.  Thank you.

17             THE COURT:  With that, then the government may

18  call its first witness.

19             MS. SCHNELLINGER:  Thank you.

20       The United States calls Special Agent Austin Johnston

21  to the stand.

22             THE COURT:  Please come forward and be sworn.

23  Please raise your right hand.

24             (The witness is sworn.)

25       You can now be seated.  You can move the chair and

Austin Johnston - Direct

1    microphone to make yourself comfortable.

2         Ms. Schnellinger, when you are prepared to proceed.

3              MS. SCHNELLINGER:  Thank you, Your Honor.

4         DIRECT EXAMINATION OF AUSTIN JOHNSTON

5    BY MS. SCHNELLINGER:

6    **Q.**   Sir, can you please state your name, and spell your

7    last name for the record.

8    **A.**   Austin Johnston, J-O-H-N-S-T-O-N.

9    **Q.**   By whom are you employed?

10   **A.**   The Federal Bureau of Investigation.

11   **Q.**   And what are your duties and responsibilities with

12   them?

13   **A.**   To investigate and -- investigate federal violations

14   specifically as they relate to violent crimes against

15   children, violent crimes.

16   **Q.**   How long have you worked for the FBI?

17   **A.**   Approximately five years.

18   **Q.**   How long have you been in law enforcement?

19   **A.**   Approximately eight years.

20   **Q.**   Where were you before the FBI?

21   **A.**   The Texas Department of Public Safety.

22   **Q.**   And what did you do for them?

23   **A.**   I was a state trooper.

24   **Q.**   Were you involved in the investigation of a Michael

25   Monroe James?

Austin Johnston - Direct

1    **A.**    I was.

2    **Q.**    And what was your role in the investigation?

3    **A.**    Initially just to assist and interview with the lead

4    case agent.

5    **Q.**    And are you aware of the nature of the investigation?

6    **A.**    I was.

7    **Q.**    And what was it?

8    **A.**    We had received a lead from a colleague at a different

9    office regarding a user who was engaged in online chat

10   communication.

11   **Q.**    What kind of online chat communication?

12   **A.**    Specifically through the Whisper application.

13   **Q.**    And what was the nature of that conversation?

14   **A.**    In summary, the individual was attempting to meet with

15   an 11-year-old who identified themselves as an 11-year-old

16   female.

17   **Q.**    And this was referred to your agency?

18   **A.**    From our agency to our office.

19   **Q.**    Where is your office?

20   **A.**    Canton, Ohio.

21   **Q.**    And with that information what did you do?

22   **A.**    I specifically didn't do anything with the

23   information.  I was just there to assist with the interview.

24   **Q.**    And who was that interview to be with?

25   **A.**    Michael James.

Austin Johnston - Direct

1   **Q.**    And how did your agency come to determine Michael

2   James was a target of the investigation?

3   **A.**    So a task force officer had received information from

4   an IP address.  That IP address came back to a residence,

5   and one of the residences -- one of the occupants of that

6   residence was Michael James.

7   **Q.**    And you've referenced several times about an

8   interview.  When did that take place?

9   **A.**    Approximately July of '24.

10  **Q.**    Would I be correct in saying July 1 of 2024?

11  **A.**    Correct.

12  **Q.**    And who was part of this interview?

13  **A.**    Myself, Task Force Officer Katherine Jarvis, and

14  Michael James.

15  **Q.**    And where did you go to conduct this interview?

16  **A.**    We went to Michael James' residence.

17  **Q.**    And did you and Task Force Officer Jarvis ride

18  together in the same vehicle?

19  **A.**    We did.

20  **Q.**    What did you see when you arrived on the scene?

21  **A.**    The particular duplex, I believe it is, was situated

22  pretty far back from the road.  As we were driving down the

23  driveway we observed Michael James sitting out front on his

24  front step.  We drove around back and parked behind the

25  residence.

Austin Johnston - Direct

1    **Q.**    And then what happened?

2    **A.**    Myself and -- or excuse me -- Officer Jarvis exited

3    the vehicle, walked around the front of the residence to

4    make contact with Michael, and Michael was no longer sitting

5    outside.

6    **Q.**    What were the two of you wearing?

7    **A.**    I would just say ordinary, like street clothes.

8    **Q.**    Did you have anything that displayed what law

9    enforcement agency you were from?

10   **A.**    We did not.

11   **Q.**    Did you have firearms?

12   **A.**    We did.

13   **Q.**    Where were they?

14   **A.**    Mine was -- I carry what's called appendix.  It's

15   basically on your waist -- excuse me -- where your stomach

16   is situated, underneath a T-shirt, and I believe Officer

17   Jarvis does the same.

18   **Q.**    So would that be correct in saying they were not

19   visible?

20   **A.**    Correct.

21   **Q.**    So you parked your vehicle.  What happens next?

22   **A.**    We walked around the front of the residence to make

23   contact with Michael and identify ourselves, and Michael was

24   no longer in front of the house.  So we rang -- excuse me.

25   We knocked on the door a couple of times.

Austin Johnston - Direct

1          We didn't receive any answer, so we rang the doorbell.

2     I believe it was a Ring doorbell or some similar company.

3     After we rang that doorbell eventually a male's voice came

4     over the camera.

5     **Q.**    And did that individual identify themselves?

6     **A.**    I don't recall.

7     **Q.**    And what did you tell this individual?

8     **A.**    To your last question, throughout the conversation we

9     had determined that it was Michael's father.  I don't

10     specifically remember his name.

11          We stated that we were looking to speak with Michael

12     in regards to an investigation that we had.  We told him

13     that we were knocking on the door, we had seen him outside,

14     but he wasn't answering.  And he indicated to us that he

15     would call him, because Michael should be home.

16     **Q.**    So what happens next?

17     **A.**    Eventually Michael comes downstairs, answers the door,

18     and we identified ourselves and asked if we could speak with

19     him.

20     **Q.**    And is this in the doorway, is this outside? Where are

21     you talking?

22     **A.**    Michael is in the doorway, and we were both stepped

23     down onto the grass in front of the residence.

24     **Q.**    So when you ask if you could talk to him what does he

25     say to you?

Austin Johnston - Direct

1    **A.**    He didn't have any issue talking.  I asked him if he

2    would like to go talk somewhere, essentially away from the

3    Ring doorbell, just so that we could have a conversation

4    between the three of us.

5    **Q.**    Was his father still on the Ring Doorbell?

6    **A.**    I don't recall him specifically speaking, but the

7    assumption was that he was still there.

8    **Q.**    So what happens next?

9    **A.**    We walked over to the side of the building and just

10   started to have a conversation with him.  Specifically, Task

11   Force Officer Jarvis explained why we were there.

12   **Q.**    So then what happens?

13   **A.**    During that conversation Michael brings up -- or

14   Officer Jarvis explained why we were there, and we had asked

15   Michael if he would like to go somewhere more private that

16   wasn't in front of neighbors and the general public to have

17   this conversation, just based upon what the conversation

18   entailed.  And he was receptive to that, and we went inside

19   his residence.

20   **Q.**    Who made the decision to go inside his house?

21   **A.**    I asked him if he would like to go talk somewhere more

22   private, and from what I recall it was a mutual -- I don't

23   think anybody specifically asked to step inside the

24   residence, it was just kind of inferred.

25   **Q.**    I see.  At some point do you ever record any of this

Austin Johnston - Direct

1    conversation?

2    **A.**    We do.

3    **Q.**    When does that happen?

4    **A.**    Right before we ended up going inside his residence.

5    **Q.**    When Task Force Officer Jarvis explains to Mr. James

6    the reason you were there, how does Mr. James respond to

7    that?

8    **A.**    At first he appeared mildly confused, but as we

9    continued to talk he identified the fact that he did use the

10   application that we were inquiring about.

11   **Q.**    Now, you stated that you had a recording.  Where was

12   the recorder at?

13   **A.**    It was inside of a notebook.

14   **Q.**    And at what point do you turn this on?

15   **A.**    Mid conversation between Michael and Officer Jarvis.

16   **Q.**    So are you still outside?

17   **A.**    Yes.

18   **Q.**    Okay.  And you've provided that to the United States;

19   is that correct?

20   **A.**    I did.

21   **Q.**    And the United States has provided it to the defense.

22                  MS. SCHNELLINGER:  Your Honor, with the

23   Court's permission, the United States would like to play

24   Government's Exhibit 1, which is the recording that we've

25   discussed.

Austin Johnston - Direct

1           THE COURT:  Any objection, Mr. Bryan?

2           MR. BRYAN:  No objection, Your Honor.

3           THE COURT:  All right, certainly.

4           (Recording played.)

5           THE COURT:  Can we just pause that for one

6    second?  There's a little bit of feedback, and maybe a

7    volume issue.

8           MS. SCHNELLINGER:  I am going to try again,

9    Your Honor.

10          (Recording played.)

11   **Q.**    Did we miss part of the conversation that the

12   recording -- when this recording picks up?

13   **A.**    Yes.

14   **Q.**    What were the three of you talking about when the

15   recording turns on?

16   **A.**    Officer Jarvis specifically asked him whether or not

17   he had any -- if he was on any medications.  Throughout the

18   course of the conversation Michael had stated that he's had

19   anger problems in the past.  Officer Jarvis had asked him

20   whether or not he was currently having any of those thoughts

21   or concerns, to which he said no, he didn't have those

22   concerns after he stopped taking his medications.

23          So while he was on medications he was having anger

24   problems, when he was off the medications they subsided, and

25   he was not currently taking any medications.

Austin Johnston - Direct

1    **Q.**    And that's when this recording picks up; is that

2    correct?

3    **A.**    Correct.

4                    (Recording played.)

5    **Q.**    Can I ask you the setup of the house?

6          Can you describe the setup of the house? You said it

7    was a duplex, correct?

8    **A.**    Correct.

9    **Q.**    And can you describe where you guys went into the

10   house?

11   **A.**    Yeah.  When you first enter the residence it's like a

12   split level, so you go from upstairs to downstairs.  You

13   immediately go upstairs, which is where the living room is

14   situated.  From what I recall, to the right-hand side was

15   like a hallway with some bedrooms, and then if you're like

16   looking at a clock, at your 11:00 was the kitchen.  And when

17   you come up the stairs, at your 12:00 there is a long couch.

18   **Q.**    Where did everybody sit?

19   **A.**    Michael sat on the couch facing the doorway, and then

20   myself and Officer Jarvis sat to his right, so it is set up

21   like an L.

22                    (Recording played.)

23   **Q.**    Can you describe Mr. James' demeanor at this point?

24   **A.**    I would say nervous but relatively relaxed, cordial.

25   **Q.**    At some point there is a statement that we just heard

Austin Johnston - Direct

1  that you make reference of nervousness.  Why did you make

2  that reference?

3  **A.**    He would just -- I don't want to say he was -- he was

4  kind of all over the place, talking a lot, just moving his

5  hand all over.  Just showed signs of being nervous.

6  **Q.**    Did you endeavor to calm him down at all?

7  **A.**    Yeah.  We -- I mean, I told him initially that I could

8  tell that he appeared nervous, that there was really no

9  reason to be nervous, our intent was to just have a

10  conversation with him.  If our intent was to do something

11  else, like arrest him for example, we wouldn't have come

12  just the two of us in plain clothes, showing, you know, no

13  display of handcuffs or anything like that.

14  **Q.**    Where were your handcuffs?

15  **A.**    They were on my back, but underneath my T-shirt.

16  **Q.**    So at this point no handcuffs displayed, no firearm

17  displayed?

18  **A.**    Correct.

19  **Q.**    Thank you.

20              (Recording played.)

21  **Q.**    Who were you talking to on the phone?

22  **A.**    Michael's mother.

23  **Q.**    And you referenced historical incidents.  What were

24  you referencing there, and why?

25  **A.**    I'm not aware of any specific instances.  When we were

Austin Johnston - Direct

1    talking to Michael he indicated he had anger problems and

2    referred to historically in the past, and he was concerned

3    that his -- he didn't want his parents to know why we were

4    there, so he pretty much gave us the coaching as to what to

5    tell his parents, that we were there for anger issues, as

6    opposed to what we were actually there for.

7    **Q.**   When did that occur? Was that before you took the

8    phone?

9    **A.**   Correct.

10   **Q.**   So is -- there's mumbling.  Is that between you and

11   Mr. James?

12   **A.**   Correct.  He's -- at one point in the video you can

13   hear me kind of stop talking to Mrs. James and say, like,

14   what did you say or what was that, and that was because he

15   was kind of like miming what to tell her and not tell her.

16   **Q.**   So the historical incidents, that statement came from

17   Mr. James?

18   **A.**   That's correct.

19   **Q.**   And at any point did you prevent him from answering

20   the phone?

21   **A.**   No, I told him to answer it.

22   **Q.**   And how many different phones were ringing?

23   **A.**   So he had, from my recollection, just one phone, but

24   it was hooked to I want to say an Alexa, so when the phone

25   rang it seemed as if there was the phone ringing as well as

Austin Johnston - Direct

1    the Alexa ringing, which is why you hear two different tones

2    in the house.

3    **Q.**    I see.  Thank you.

4                 (Recording played.)

5    **Q.**    Can you describe what just happened and what form you

6    just asked for?

7    **A.**    So I had asked Michael if he would sign the consent to

8    search form for his phone.  In the process, Michael was

9    trying to delete his Whisper app just based upon the

10   conversation we were having.  I asked him to pretty

11   much -- at that point, based upon the conversation we had

12   had, I asked him to like -- we would do it jointly.  That

13   way he didn't have just ownership of the phone at that

14   point, just because we had determined that there was likely

15   probable cause that there was evidence on there.

16        So I asked Michael if he would be willing to sign a

17   consent form for us to search that phone, and that's the

18   form that I had issued to him that he had consented to and

19   signed.

20   **Q.**    Thank you.  So far during this -- this is about 13

21   minutes so far, can you describe Mr. James' demeanor

22   throughout?

23   **A.**    I would say that it was the same as initially.  He

24   still appeared nervous, just like all over the place kind

25   of, but also very cooperative and somewhat forthcoming.

Austin Johnston - Direct

1    **Q.**    What about physically, did you see anything

2    physically?

3    **A.**    I did not.

4    **Q.**    At any point in this time so far was he crying? Did he

5    have any other visible displays of emotion?

6    **A.**    No, not at this point.

7    **Q.**    Thank you.

8                    (Recording played.)

9    **Q.**    During this recording it seems like Mr. James is

10   making some unintelligible noises.  Do you recall that?

11   **A.**    I do.

12   **Q.**    Do you recall what was going on when he was making

13   those noises?

14   **A.**    He started to get upset based upon the conversation

15   that we were having.

16   **Q.**    How did he display that he was upset?

17   **A.**    I'd say he started to cry.

18   **Q.**    He made some other comments about when he was

19   downloading things he did that when he was not in his right

20   mind, angry, and depressed.  Is that correct?

21   **A.**    Correct.

22   **Q.**    Did he ever say at any point before the recording, at

23   any point at all during your conversation, that he was angry

24   or depressed at that time you were there talking to him?

25   **A.**    No.

Austin Johnston - Direct

1    **Q.**    Besides starting to cry, did he have any other change

2    in demeanor?

3    **A.**    Not that I recall.

4    **Q.**    What about yourself and Task Force Officer Jarvis,

5    where were you during this entire time so far?

6    **A.**    Neither of us left our chairs.

7    **Q.**    At any point did you display your handcuffs, display

8    your firearms, or make any movements toward him?

9    **A.**    No.

10                  (Recording played.)

11   **Q.**    Who just came into the conversation?

12   **A.**    Michael's mother.

13   **Q.**    I'd like to back you up a little bit.  You said in

14   some -- you talked about Whisper, Telegram, and MEGA.  What

15   do those sites tell you? If he's looking at those sites,

16   what do those sites tell you?

17   **A.**    Based upon my experience, a lot of them go hand in

18   hand that he's using -- generally the path works is people

19   will talk on Telegram and they'll share MEGA links, which is

20   what MEGA is.  And then they'll go over to MEGA and use

21   those links, which generally contain -- they can contain

22   other things, but in this particular instance child

23   pornography.

24   **Q.**    So based on your training and experience and the

25   nature of this investigation, did Mr. James admit to

Austin Johnston - Direct

1    downloading child pornography?

2    **A.**    He did.

3    **Q.**    And at that point, is that when he says "I want to

4    kill myself"?

5    **A.**    I don't recall.

6    **Q.**    But at some point does he make that statement?

7    **A.**    He does.

8    **Q.**    And I believe you respond something along the lines

9    "You don't need to do that," or something like that?

10   **A.**    Sounds correct.

11   **Q.**    What was his demeanor at that point?

12   **A.**    He was still upset.

13   **Q.**    What do you mean by upset?

14   **A.**    Putting his head down; not like actively sobbing or

15   anything like that, just maybe ashamed is the way to

16   describe it.

17   **Q.**    And then mom comes in; is that right?

18   **A.**    Correct.

19              (Recording played.)

20   **Q.**    What happens when you leave?

21   **A.**    Both myself and Officer Jarvis just returned to our

22   vehicle and departed the residence.

23   **Q.**    And what happened to Mr. James?

24   **A.**    He stayed at his house and was speaking with his

25   mother when we left.

Austin Johnston - Direct

1   **Q.**    Throughout the entire conversation did he express that

2   he has any mental illnesses to you?

3   **A.**    No.

4   **Q.**    He did state that he was angry and depressed and not

5   in his right mind at some point, right?

6   **A.**    Correct.

7   **Q.**    But that was -- was that during the interview or was

8   that at other times?

9   **A.**    At other times, specifically when he was engaging in

10  illicit activity.

11  **Q.**    Prior to the recording coming on there was talk of

12  medications; is that right?

13  **A.**    Correct.

14  **Q.**    Did he ever express why he was on medication?

15  **A.**    I don't recall what those were.

16  **Q.**    And did he state -- and he stated, I believe, that

17  he's off those medications.  Is that right?

18  **A.**    Correct, because he was angry when he was on them.

19  **Q.**    Prior to the recording and up until the confession did

20  he ever express any suicidal tendencies?

21  **A.**    Just inferred it toward the end of the -- pretty much

22  at the end of the interview, when we were discussing the

23  applications on his phone, and he stated he wanted to hurt

24  himself.

25  **Q.**    And we talked about your demeanor several times.  Did

Austin Johnston - Cross

1    your demeanor change at any point throughout this entire

2    interview?

3    **A.**    No.

4    **Q.**    And the only two officers that were there were

5    yourself and Task Force Officer Jarvis; is that right?

6    **A.**    Correct.

7                    MS. SCHNELLINGER:  Your Honor, I have nothing

8    further.

9                    THE COURT:  Thank you.

10         Mr. Bryan.

11                    MR. BRYAN:  Thank you, Judge.

12         CROSS-EXAMINATION OF AUSTIN JOHNSTON

13    BY MR. BRYAN:

14    **Q.**    Is it Special Agent Johnson, or Johnston?

15    **A.**    Johnston with a T.

16    **Q.**    With a T.  Thank you.

17         Sir, you indicated that this investigation began with

18    information that you received from another law enforcement

19    agency, correct?

20    **A.**    Same law enforcement agency, just different office.

21    **Q.**    Okay, so a different office.  And there was an officer

22    or an agent who was working undercover on the Whisper app,

23    correct?

24    **A.**    That's correct.

25    **Q.**    And it was that officer who was pretending to be an

Austin Johnston - Cross

1    11-year-old pregnant girl, correct?

2    **A.**    I don't know about the pregnancy, but I am familiar

3    with him representing his account as an 11-year-old female.

4    **Q.**    Okay.  And it was basically someone pretending to be

5    an 11-year-old female that caused somebody from Mr. James'

6    IP address to interact with that 11-year-old, correct?

7    **A.**    Correct.

8    **Q.**    Okay -- or with that purported 11-year-old.

9    **A.**    Correct.

10   **Q.**    So just to be clear, it wasn't a real 11-year-old, it

11   was an undercover FBI agent pretending to be an 11-year-old,

12   correct?

13   **A.**    Correct.

14   **Q.**    And that conversation, didn't that take place like

15   months before you interviewed Mr. James?

16   **A.**    I don't recall how long, but relatively recent,

17   correct.

18   **Q.**    But it wasn't immediately after that conversation or

19   that texting took place?

20   **A.**    Not immediately after.

21   **Q.**    And so you indicated that the officer actually got

22   information and learned that they came from a particular IP

23   address, correct?

24   **A.**    Correct.

25   **Q.**    And that IP address is actually registered to

Austin Johnston - Cross

1    Mr. James' father, correct?

2    **A.**    That sounds accurate.

3    **Q.**    But you didn't know who particularly at that home was

4    the person interacting with the undercover agent, correct?

5    **A.**    It wasn't confirmed, no.

6    **Q.**    You said in your direct testimony that you believed

7    that person to be Michael James, correct?

8    **A.**    Can you repeat that?

9    **Q.**    You said in your direct testimony that you were there

10   because you believed that the person who had interacted with

11   the undercover agent was Michael James, correct?

12   **A.**    That's correct.

13   **Q.**    And not his father or anyone else who may have been at

14   that IP address?

15   **A.**    Correct.  From my understanding, he had sent an image

16   or his account had an image of him tied to it.

17   **Q.**    So there was some type of image that led you to

18   believe that it was Michael James?

19   **A.**    Correct.

20   **Q.**    And so when you -- you went to the residence, you

21   indicated -- you said it was sort of a long driveway up to

22   the -- well, it was basically a duplex?

23   **A.**    Correct.  It was offset from the road.  The parking

24   lot or all the parking spaces were situated behind the

25   house.  Up front is nothing but grass and a hill.

Austin Johnston - Cross

1    **Q.**    As you drove up to the residence you saw Michael James

2    sitting on the porch area?

3    **A.**    Correct.  I think his dog was out there with him as

4    well.

5    **Q.**    And then you parked around the back of the residence,

6    and by the time you came back around the front of the

7    residence he was no longer sitting outside the residence,

8    correct?

9    **A.**    Correct.

10   **Q.**    And is there any indication that he saw you or

11   recognized you as law enforcement officers as you drove

12   around behind the house?

13   **A.**    Not to my knowledge.  We were just driving an SUV.

14   **Q.**    Okay.  And so when you got to the front of the house

15   and knocked on the door nobody answered, right?

16   **A.**    Correct.

17   **Q.**    And so you pressed the doorbell, which was a Ring

18   device or something similar to a Ring device?

19   **A.**    That's correct.

20   **Q.**    And a male voice answered, answered the door, correct?

21   **A.**    Correct.

22   **Q.**    And did that person identify you as -- identify

23   himself to you, or just the owner of the residence in some

24   way?

25   **A.**    Just for clarification, when you said answering the

Austin Johnston - Cross

1    door, are you referencing the actual door or the doorbell?

2    **Q.**    The doorbell, the Ring bell, correct.

3    **A.**    I don't recall if he identified himself.

4    **Q.**    But you had a conversation with somebody over the Ring

5    bell, correct?

6    **A.**    Correct.

7    **Q.**    And did you indicate who you were specifically, or

8    just generally at that time?

9    **A.**    I believe it was generally at that time.

10   **Q.**    But you did identify yourself as law enforcement?

11   **A.**    From my understanding.

12   **Q.**    And the person indicated that his son was home and

13   that he would get ahold of his son and tell him to answer

14   the door?

15   **A.**    Yeah.  I believe he said he would call him.

16   **Q.**    Okay.  And shortly after that Michael James answered

17   the door?

18   **A.**    Correct.

19   **Q.**    And he stepped outside with you guys?

20   **A.**    Yes.

21   **Q.**    And some conversation took place while you were

22   outside the home, correct?

23   **A.**    Correct.

24   **Q.**    Okay.  Just to be clear, you did not advise him of

25   what we would call *Miranda* warnings?

Austin Johnston - Cross

1    **A.**    No.

2    **Q.**    And you know what *Miranda* warnings are from your

3    training and experience, correct?

4    **A.**    I am.

5    **Q.**    And you know under what circumstances you are required

6    to give *Miranda* warnings, correct?

7    **A.**    Correct.

8    **Q.**    And that is if you're going to conduct a, quote,

9    custodial investigation, correct --

10   **A.**    Correct.

11   **Q.**    -- or a custodial interview.  And you know the word

12   custodial isn't the same as arrest, right?

13   **A.**    Correct.

14   **Q.**    Custodial is any situation where somebody may not

15   believe that they're free not to talk to you, correct?

16                    MS. SCHNELLINGER:  Objection.

17                    THE COURT:  If you know, you can answer.

18   **A.**    That's a facet of it, yes.

19   **Q.**    Okay.  So basically is it sort of in the mind of the

20   targeted individual, correct, or what a reasonable person in

21   the mind of a targeted individual would think based on the

22   circumstances?

23   **A.**    I would say it's a mixture --

24                    THE COURT:  I want to be careful with that

25   question, Mr. Bryan.  He's not a lawyer.  I understand what

Austin Johnston - Cross

1    you're trying to do based on his training, but I don't want

2    the question to be said in a way that is not entirely

3    accurate with the law; so if you could rephrase that

4    question.

5              MR. BRYAN:  Yes.  Thank you, Your Honor.

6    **Q.**    You know from your experience as an FBI agent that

7    there are circumstances under which you have to provide

8    someone's *Miranda* warnings to them, correct?

9    **A.**    I'm familiar, yes.

10   **Q.**    And it's not necessarily required only when a person

11   is under official arrest, correct?

12   **A.**    Correct.

13   **Q.**    Or when the person is in the police station, correct?

14   **A.**    Correct.

15   **Q.**    It's under circumstances where a person may reasonably

16   believe that they're not free to avoid or to leave the

17   interview, correct?

18   **A.**    Again, I'd say that's a facet of it, yes.

19   **Q.**    So when you were outside talking to Mr. -- we don't

20   know exactly what you said, but did you make it clear to

21   Mr. James that the interview at that time was voluntary,

22   that he didn't have to take part in it?

23   **A.**    I think that it was implied through the conversation,

24   yes.

25   **Q.**    So you say it was implied, but was it specifically

Austin Johnston - Cross

1    articulated?

2    **A.**    We did not make a specific statement to say you are

3    free to leave and walk away if you want to.

4    **Q.**    Okay.  But eventually you guys do come into the home.

5    Can you estimate how long you were outside the home before

6    you went in?

7    **A.**    I'd say approximately -- no longer than ten minutes.

8    **Q.**    So it was a significant period of time then, correct?

9    **A.**    It depends on your definition of significant.

10   **Q.**    Okay.  Well, we just listened to about 25 minutes of

11   tape, correct?

12   **A.**    I don't know how long it was.

13   **Q.**    Okay.  And about a third of that or less than a third

14   of that would be 10 minutes, correct?

15   **A.**    It would be.

16   **Q.**    Okay.  So would you characterize it as a chunk of time

17   that you actually were talking outside?

18   **A.**    If we are comparing it to 23 minutes, then yes.

19   **Q.**    Okay.  But at that time the audio wasn't activated,

20   correct?

21   **A.**    Correct.

22   **Q.**    Okay.  It could have been activated while you were

23   talking outside, right?

24   **A.**    It could.

25   **Q.**    But you chose not to at that time?

Austin Johnston - Cross

1   **A.**    It was not an intentional act.

2   **Q.**    You just didn't.

3   **A.**    We were engaged in the conversation and we forgot.

4   **Q.**    Okay.  So when you went in through the front door

5   that's basically when you activated the audio, the tape

6   recording, correct?

7   **A.**    It was activated outside.

8   **Q.**    Was it just before you walked in the front door?

9   **A.**    We were still engaging in the conversation on the side

10  of the residence.  I activated that, and then I would say

11  approximately two minutes later we walked inside.

12  **Q.**    And that's when you -- I don't want to replay all the

13  tape again, I will play portions of it, but that's when we

14  hear the dog barking.  The dog was inside the door?

15  **A.**    Correct.

16  **Q.**    And so then Michael put the dog somewhere so he

17  wouldn't interfere in the conversation?

18  **A.**    Correct.

19  **Q.**    And then you guys took your places in the living room

20  where you were going to talk, correct?

21  **A.**    Correct.

22  **Q.**    And almost immediately when you were inside the

23  residence, and maybe even outside the residence, do you

24  recall whether or not Michael's cell phone was being called

25  by anybody when you were outside the residence?

Austin Johnston - Cross

1   **A.**   I -- no, I don't even think he had his phone on him

2   outside the residence.

3   **Q.**   Okay.  So the phone may have just been inside the

4   residence then?

5   **A.**   It would be my assumption.  It didn't ring, so --

6   **Q.**   But as soon as he was inside the residence the phone

7   started ringing, correct?

8   **A.**   Correct.

9   **Q.**   And you said that -- and it appeared that it was his

10  mother who was calling him?

11  **A.**   It was a mixture of his mother and father.

12  **Q.**   And you specifically instructed Michael to answer his

13  mother, correct?

14  **A.**   I did.

15          MR. BRYAN:  I'm going to play that portion of

16  the tape.

17          THE COURT:  If you're going to do snippets,

18  Mr. Bryan, are you able to identify a time?

19          MR. BRYAN:  Yes.  This would be -- I'm

20  beginning the time at 4:35.

21          THE COURT:  Thank you.

22          MR. BRYAN:  Are we on my -- I don't hear

23  anything.

24          (Pause in proceedings.)

25          I'm sorry, Your Honor.

Austin Johnston - Cross

1           THE COURT:  That's all right.  Take a moment.

2           MR. BRYAN:  It may be the connection.

3           THE COURT:  It may be the connection is better

4    at the podium? Or we can try this first.

5           (Pause in proceedings.)

6           (Recording played.)

7    BY MR. BRYAN:

8    **Q.**    Okay.  I let that play a little bit beyond the mother,

9    but basically you encourage Michael to answer the phone for

10   his mother, correct?

11   **A.**    Correct.

12   **Q.**    And then he did, and then you took the phone from

13   Michael and helped Mike basically mislead his mother,

14   correct?

15   **A.**    Correct.

16   **Q.**    And you can hear Michael say in the background they

17   don't need to know, correct?

18   **A.**    Correct.

19   **Q.**    And what was being discussed prior to the mother

20   calling was the Whisper app, correct?

21   **A.**    Correct.

22   **Q.**    Because that's the app that was used to talk to the

23   undercover FBI agent, correct?

24   **A.**    Correct.

25   **Q.**    So it was through that app that the inappropriate

Austin Johnston - Cross

1    conversations with what was believed to be an 11-year-old

2    girl were taking place, correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And then as you went forward and after you hung

5    up with the mother you said, you know, you wanted to

6    continue talking about his use of that Whisper app and said

7    as long as he remained to be upfront and honest about that

8    then -- you used the word purge, I'm not sure what you meant

9    by that -- that we can purge all of this?

10   **A.**    I was implying that we could delete the application so

11   he didn't have access to it.

12   **Q.**    So you were leaving him with the impression that as

13   long as you're honest with us we'll just delete the app and

14   be on our way? Is that sort of the impression you were

15   giving him at that time?

16   **A.**    I was giving him the impression that he wasn't going

17   to jail that day.

18   **Q.**    Okay, but that you were just going to purge an app,

19   but it was sort of conditional though, right? Because you

20   said as long as you're honest with us.  You wanted complete

21   honesty, correct?

22   **A.**    I did.

23   **Q.**    So you were leading him to believe that if he wasn't

24   honest things may not go as well, correct?

25   **A.**    Correct.

Austin Johnston - Cross

1    **Q.**    Okay.  And so you said specifically "As long as you're

2    upfront and honest with us then maybe we can just purge the

3    app," right?

4    **A.**    Correct.

5    **Q.**    Implying that if he wasn't honest with you something

6    else could happen.

7    **A.**    Correct.

8    **Q.**    And then almost immediately after mom called dad

9    called, correct?

10   **A.**    At some point.

11                   (Recording played.)

12   **Q.**    So the phone started ringing again, and you said "It's

13   just your dad"?

14   **A.**    Correct.

15   **Q.**    And then you let the phone ring, correct?

16   **A.**    I didn't have possession of the phone.

17   **Q.**    All right.  Well, you didn't tell him to answer the

18   phone, right?

19   **A.**    No, he's an adult.

20                   (Recording played.)

21   **Q.**    And your partner said "He'll call your mom"?

22   **A.**    Correct.

23   **Q.**    Basically telling him that don't worry about answering

24   the phone from dad, dad will call mom and find out what's

25   going on.

Austin Johnston - Cross

1    **A.**    Correct.

2    **Q.**    And maybe dad already talked to mom and learned that

3    the FBI was interviewing his son that morning, correct?

4                    MS. SCHNELLINGER:  Objection.  Speculation.

5                    THE COURT:  Sustained.

6                    MR. BRYAN:  I'll move on, Your Honor.

7                    (Recording played.)

8    **Q.**    Another phone starts to ring, it sound like maybe the

9    home phone?

10   **A.**    I'm not sure.  A phone -- I was under the impression

11   that one of them was linked to the Alexa.  I'm not sure, but

12   a phone was ringing.

13   **Q.**    Okay, but Michael's cell phone stopped ringing and

14   then another phone started to ring, correct?

15   **A.**    Another tone, correct.

16                    (Recording played.)

17   **Q.**    So we're at 9:05 on the time tracker of this call.

18   That's not the time, but 9 minutes and 5 seconds in.

19         The Alexa voice, or whatever voice, was saying call

20   from "James, David"; David, correct?

21   **A.**    I couldn't hear it on the recording, but I did hear

22   "James."

23   **Q.**    And then the person left a message.  His father left a

24   message, correct?

25   **A.**    I don't know.

Austin Johnston - Cross

1    **Q.**    Well, did you hear the voice in the background?

2                    (Recording played.)

3    **Q.**    Do you hear the father saying "Call, call me now.

4    Call me now"?

5    **A.**    I didn't hear that, no.

6    **Q.**    You didn't hear that? Did you hear the voice in the

7    background?

8    **A.**    No.  I mean, you can play it again.  I apologize.

9    **Q.**    Yeah.  I mean, the tape speaks for itself, but -- and

10   frankly you may be able to hear it better just directly from

11   the --

12                   (Pause in proceedings.)

13                   (Recording played.)

14   **Q.**    Did you hear him, he said "Michael, call me back now"?

15   **A.**    I did.

16   **Q.**    And so you were present when he was saying that,

17   correct?

18   **A.**    I was.

19   **Q.**    And you didn't instruct Mike to call his dad back

20   then, correct?

21   **A.**    I did not.

22   **Q.**    And the reason you didn't was because you were

23   concerned his father would have interfered in the

24   interrogation or in the interview, right?

25   **A.**    One reason.

Austin Johnston - Cross

1    **Q.**    And you already knew from your first introduction with

2    Michael that he had had some mental health issues in the

3    past, correct?

4    **A.**    No.

5    **Q.**    He talked about having to be on medication for certain

6    things?

7    **A.**    I don't know what those were for.  He didn't specify,

8    to the best of my memory.

9    **Q.**    But he said he stopped taking the medications because

10   he wasn't able to remember things and it made him feel

11   worse?

12   **A.**    Because, he said, it made him feel angry.

13   **Q.**    Okay.  So anger is a mental condition, correct?

14   **A.**    I'm -- I don't know.

15   **Q.**    All right.  Just this is the first time you were

16   meeting Michael James, correct?

17   **A.**    It was.

18   **Q.**    And could you tell that he had maybe had some mental

19   health problems in the past?

20   **A.**    No.

21   **Q.**    But you did know that his dad was trying to intervene

22   at this juncture of the interview, correct?

23   **A.**    Correct.

24   **Q.**    And you chose not to allow his father to intervene at

25   that time?

Austin Johnston - Cross

1    **A.**    He could have called him.

2    **Q.**    Okay.  Well, you didn't tell him to call like you told

3    him to call his mother, you didn't tell him to call his

4    father, correct?

5    **A.**    Correct.

6    **Q.**    All right.  And so you just continued on with the

7    interview, right?

8    **A.**    Right.

9    **Q.**    And as the interview went on you then -- again, you're

10   talking mostly about this Whisper app, correct?

11   **A.**    Correct.

12   **Q.**    And you're basically trying to get him to identify

13   different people -- or not people, but different

14   conversations he may have had over Whisper, right?

15   **A.**    I was just trying to get his memory to come back.

16   **Q.**    And to get him to talk about Whisper?

17   **A.**    Correct.

18   **Q.**    And during the conversation regarding Whisper you then

19   presented him with a consent to search form, correct?

20   **A.**    Correct.

21   **Q.**    Do you have that form with you today?

22   **A.**    I do not.

23   **Q.**    Okay.  Did you read that form to him verbatim?

24   **A.**    Uhm, from my understanding, I did.  Generally it's

25   standard.  While we're providing it to them we generally

Austin Johnston - Cross

1    read it out loud and display it in front of them so they can

2    read along.

3    **Q.**    Okay.  I'm beginning at around 11:14 minutes.

4                      (Recording played.)

5    **Q.**    So at about 12:01 on the tracker you said "The only

6    form I'm going to ask you to sign today is a consent to

7    search form," correct?

8    **A.**    Correct.

9    **Q.**    And then you went on to say, "This is sort of to gauge

10   your truthfulness," right?

11   **A.**    Correct.

12   **Q.**    And what you were leading him to believe was that you

13   wanted to be able to look at his phone to confirm what he

14   was telling you about the Whisper app, correct?

15   **A.**    And other reasons.

16   **Q.**    Well, you didn't tell him "and other reasons," you

17   just told him the Whisper app, correct?

18   **A.**    I said et cetera.

19   **Q.**    So you said "the Whisper app, et cetera," right?

20   **A.**    Correct.

21   **Q.**    And I'm going to continue to play.

22                      (Recording played.)

23   **Q.**    So you showed him the form and you said "I want you to

24   read this right here," correct? That's what we heard on the

25   tape?

Austin Johnston - Cross

1    **A.**    Correct.

2    **Q.**    And then you said "It says you have a right to refuse

3    it," and you just continue to talk over it, but you didn't

4    actually read the form with him, right?

5    **A.**    No.  I was with him.  The form is presented in front

6    of him, and then I just read it alongside of him.

7    **Q.**    Well, it sounds to me like you were sort of

8    summarizing what the form was all about, like you have the

9    right to refuse, that that would have been in the form

10   itself, right?

11   **A.**    Can you rephrase your question?

12   **Q.**    Okay.  Is it your testimony that you were reading the

13   form to him verbatim or that you were just generally telling

14   him what the form was?

15   **A.**    The form was read to him as he read along.

16   **Q.**    Okay.  And do you know for a fact he was actually

17   reading the form itself?

18   **A.**    He was looking at it.

19   **Q.**    Okay.

20                   (Recording played.)

21                   MR. BRYAN:  I want to go back a little bit

22   during the reading of the form, beginning at 12:59, for the

23   record.

24                   (Recording played.)

25   **Q.**    Did you hear Michael say words to the effect "This is

Austin Johnston - Cross

1    only related to this investigation?"

2    **A.**    I didn't.  Can you replay it, please?

3    **Q.**    It may be easier to hear it --

4                    (Pause in proceedings.)

5                    (Recording played.)

6    **Q.**    Did you hear him say that?

7    **A.**    I did.

8    **Q.**    So when he's signing this, all you've been talking

9    about up until that point is the Whisper app, correct?

10   **A.**    And his communications with underage minors.

11   **Q.**    Through the Whisper app, correct?

12   **A.**    One of the applications, correct.

13   **Q.**    Okay.  And so he's like "This is only related to this

14   investigation, right?" And you said yeah.

15   **A.**    Correct.

16   **Q.**    And then he signs the form?

17   **A.**    Correct.

18   **Q.**    So then he's basically admitting that he talked to

19   somebody over the Whisper app, correct?

20   **A.**    I wouldn't say he self admitted.

21   **Q.**    Okay.  Well, let me ask you this.  What you're going

22   to do from this point forward is you're going to start

23   looking at his phone with him, right?

24   **A.**    We started to, correct.

25   **Q.**    Right.  And so it wasn't -- you didn't tell him I'm

Austin Johnston - Cross

1    going to take your phone with me and subject it to forensic

2    examination down at the FBI.  You told him that you needed

3    him to sign a consent form so you could look at the phone

4    with him while you talked about the Whisper app, correct?

5    **A.**    I didn't specify what the extent of the search was.  I

6    said "the Whisper app, et cetera."

7    **Q.**    Right.  You said "the Whisper app, et cetera," but

8    you're sitting next to Michael at this time and he's going

9    to let you see that the Whisper app is on his phone, and

10   while you're sitting there with him you've led him to

11   believe you guys are going to purge the Whisper app;

12   correct?

13   **A.**    One of the things we were going to do.

14   **Q.**    But it wasn't clear to him that you were going to take

15   his phone and then subject it to a complete forensic

16   examination, correct?

17   **A.**    I can't speak for him.

18   **Q.**    No, because -- but you didn't make that clear.  You

19   didn't say that, correct?

20   **A.**    I did not say that, no.

21   **Q.**    Okay.  But the gist of this interview is you and him

22   sitting together now getting ready to look at his phone,

23   right?

24   **A.**    We're about to.

25   **Q.**    And then you ask him for his password, right?

Austin Johnston - Cross

1   **A.**    Correct.

2   **Q.**    So you can look into the phone, right?

3   **A.**    So it didn't lock.

4   **Q.**    So it doesn't lock on you, right?

5   **A.**    Yep.

6   **Q.**    And he said he had facial recognition, and you said

7   give me the PIN, and he gave you the PIN, 0725; correct?

8   **A.**    Correct.

9   **Q.**    Okay.  And then you're asking him about -- you

10  continued to ask him about Whisper applications, and he's

11  saying he can't recall specific conversations.  Do you

12  recall that?

13  **A.**    I do.

14              (Recording played.)

15              MR. BRYAN:  So this is, for the record, this

16  is 14:30.

17              (Recording played.)

18  **Q.**    At this time -- Miss Feisthamel asked you if you could

19  hear sort of an unintelligible -- at this time he's crying,

20  right? He's crying as you're going through the conversations

21  about his Whisper conversations, correct?

22  **A.**    He's starting to get upset, yes.

23  **Q.**    And he's saying things like "I can't remember a lot of

24  this, I wasn't in my right frame of mind," and all that?

25  **A.**    Yes.

Austin Johnston - Cross

1    **Q.**    He doesn't appear to be emotionally stable at that

2    time, correct?

3    **A.**    I guess it's a matter of opinion.

4    **Q.**    Okay.

5                    (Recording played.)

6    **Q.**    He's saying "I don't want to get in trouble."  He's

7    paranoid about you going through his phone, he's getting

8    upset; correct?

9    **A.**    I believe I was the one that talked about him being in

10   trouble.

11   **Q.**    Well, he said "I don't want to get in trouble," right?

12   You didn't hear that?

13   **A.**    No --

14   **Q.**    And then you said "You're not going to be in trouble,"

15   correct?

16   **A.**    Can you replay that?

17   **Q.**    Yes.

18                   (Recording played.)

19   **Q.**    Did you hear that? He said "I'm just paranoid, I don't

20   want to be in trouble," and then you said "I'm trying to

21   make it so you're not in trouble."  Correct?

22   **A.**    Correct.

23   **Q.**    Well, you knew that if he was admitting to possessing

24   child pornography or even involved in some of these

25   conversations that it's not going to be good for him that

Austin Johnston - Cross

1    he's not going to be in trouble, right?

2    **A.**    I don't make those decisions.

3    **Q.**    But you make a decision about what you tell somebody,

4    and you basically told him I'm trying to make it so that

5    you're not in trouble, right?

6    **A.**    I just relay the information as it's provided to me to

7    the U.S. Attorney's Office.

8    **Q.**    I'm not talking about that.  I'm talking about what

9    you're doing right now when you're interviewing Mr. James,

10   right?

11   **A.**    Right.

12   **Q.**    You're leading him to believe that as long as he's

13   cooperative with you and is honest with you he's not going

14   to get in trouble, right?

15   **A.**    That day.

16   **Q.**    And you would be the one who would determine whether

17   he's being cooperative or honest with you, right?

18   **A.**    Correct.

19   **Q.**    So he wouldn't be able to tell you whether or not he

20   was being cooperative or honest, right?

21   **A.**    Correct.

22   **Q.**    Okay.

23                    (Recording played.)

24   **Q.**    Did you hear what he said, the last thing at 20 -- at

25   minute 20:16?

44

Austin Johnston - Cross

1    **A.**    He says something along the lines of "going to jail or

2    not"?

3    **Q.**    He says "I just need to know if I'm going to jail

4    right now."  Okay?

5    **A.**    Okay.

6    **Q.**    So 20 minutes into this questioning of him he needed

7    to know if he was going to jail right now, right?

8    **A.**    That's what he asked.

9    **Q.**    Meaning he believed that he was going to be arrested

10   or could still be arrested, right?

11   **A.**    At that point in time.

12   **Q.**    Okay.  Well, at that point in time he was concerned

13   about being arrested, correct?

14   **A.**    20 minutes in.

15   **Q.**    Okay.  Well, I mean that's when he articulated, but he

16   articulated concerns all throughout the interview, correct?

17   **A.**    I mean, he articulated at 20 minutes.  I can't read

18   his mind up until then.

19                    (Recording played.)

20   **Q.**    So you basically told him if you're honest about it

21   you're not going to jail, correct?

22   **A.**    At that point I think there's more to the conversation

23   that took place.

24   **Q.**    I mean, I've been letting it play for the last five

25   minutes, but -- and again, the tape is an exhibit, it's

Austin Johnston - Cross

1   Government's Exhibit A, so it speaks for itself, but you're

2   saying -- you're telling him something conditionally, "If

3   you're honest with us you're not going to jail," right?

4   **A.**   Throughout the course of our conversation I said

5   you're not going to jail that day, if you continue to play

6   the recording and not just use that one piece.  I articulate

7   that to him in referencing that "If you don't have an

8   11-year-old child in your basement, then you're not going to

9   jail today."

10  **Q.**   I'll continue to play the piece, but when you said "If

11  you're honest with us you're not going to jail" -- correct?

12  **A.**   That was that statement, yes.

13  **Q.**   -- that implies if you're not honest with us that you

14  could go to jail, correct?

15  **A.**   A possibility.

16                  (Recording played.)

17  **Q.**   That's what you were referring to? You told him you

18  have handcuffs, and you're not going to jail unless you

19  found an 11-year-old down in the basement, correct?

20  **A.**   Correct.

21                  (Recording played.)

22  **Q.**   So he just revealed more information to you, correct?

23  **A.**   Yes.

24  **Q.**   That he uses an app called MEGA?

25  **A.**   Correct.

Austin Johnston - Cross

1    **Q.**    And you described earlier that that was an app that

2    people use to share links of, in some instances, child

3    pornography?

4    **A.**    Correct.

5    **Q.**    They can use it for legitimate things, too, but you

6    know that child pornography defendants frequently will use

7    that app to send images?

8    **A.**    Correct.

9                    (Recording played.)

10    **Q.**    So when Michael's mother came in, the interview was

11    basically over at that time, correct?

12    **A.**    Correct.

13    **Q.**    And then he explained to you that he would -- you told

14    him that he could explain to his parents whatever he wanted,

15    correct?

16    **A.**    Correct.

17    **Q.**    And he broke down and started crying, and talked about

18    wanting to hurt himself and hurt other people, correct?

19    **A.**    Correct.

20    **Q.**    And that he -- and his mother says "Do you feel like

21    you need some help," and he said yes, correct?

22    **A.**    Correct.

23    **Q.**    Based upon your investigation in this case, are you

24    aware of whether or not Michael and his family did arrange

25    for him to get help?

Austin Johnston - Redirect

1    **A.**    I heard that they did.

2    **Q.**    That he went and was in a mental health facility for a

3    period of time?

4    **A.**    Correct.

5    **Q.**    And that was prior to his arrest in this case,

6    correct?

7    **A.**    Correct.

8    **Q.**    And also, based upon your investigation into Mr. James

9    himself, is it true to say that this would have been his

10   first contact with law enforcement in his life?

11   **A.**    From my understanding.

12   **Q.**    So even though he's 28 years old, he had never before

13   been questioned by a police officer in this manner?

14   **A.**    No, not that I'm aware of.

15   **Q.**    Or been under investigation for anything, correct?

16   **A.**    Not that I'm aware of.

17           MR. BRYAN:  Nothing further.  Thank you,

18   Judge.

19           THE COURT:  Any redirect?

20           MS. SCHNELLINGER:  Yes, Your Honor.

21       REDIRECT EXAMINATION OF AUSTIN JOHNSTON

22   BY MS. SCHNELLINGER:

23   **Q.**    Are you aware if Mr. James had a job?

24   **A.**    I am.

25   **Q.**    Do you know what it was?

48

Austin Johnston - Redirect

1    **A.**    He worked at a fast food restaurant.

2    **Q.**    Do you know what he did there?

3    **A.**    I don't.

4    **Q.**    Do you know if he was a manager or supervisor, or

5    anything along those lines?

6    **A.**    I believe he was a manager, because through

7    conversation later on at another point in time, he had

8    mentioned working with, like, 16 or 17-year-olds.

9    **Q.**    There was a lot of talk during cross-examination about

10   the phone calls.  At any point did you prevent him from

11   answering his phone or the other phone, any phone?

12   **A.**    No.

13   **Q.**    Did at any point he show a desire to answer the phone

14   calls?

15   **A.**    At first, and we instructed him to answer his mother;

16   and then after that, no.

17   **Q.**    Throughout the interview, did Mr. James tell the truth

18   throughout the interview?

19   **A.**    No.

20   **Q.**    And are you aware if there was a second interview

21   after this?

22   **A.**    I am.

23   **Q.**    And based on the entire investigation, when you left

24   that day had Mr. James told you the full truth about his

25   activities?

1   **A.**    He had not.

2   **Q.**    So even when you left he was still lying to you?

3   **A.**    Correct.

4   **Q.**    Did his memory come back at a later time, after this

5   first interview?

6   **A.**    Vaguely.

7   **Q.**    And was this also a discussion about the consent form

8   for the consent to search the telephone? Is that right?

9   **A.**    Correct.

10  **Q.**    And you could hear it on the interview state that he

11  has the right to refuse it, is that correct?

12  **A.**    Correct.

13  **Q.**    And did he sign that form?

14  **A.**    He did.

15  **Q.**    And what does the signature reference? What does it

16  mean when you sign that form?

17  **A.**    That you're consenting for a full search of your

18  phone, whatever that entails.

19  **Q.**    Was there any caveats in that form at all? Like you

20  could only --

21  **A.**    Yeah.  You can revoke your consent at any time.

22  **Q.**    And is also the signature -- does that also mean that

23  you understand the form you're signing and that you consent

24  to the search of the phone?

25  **A.**    Correct.

1          MS. SCHNELLINGER:  Thank you, Your Honor.  I

2     have nothing further.

3          THE COURT:  Thank you.

4        You are now excused.  Thank you, Special Agent

5     Johnston.

6        We've been going for about two hours.  I propose a

7     short recess.

8        Will the government be calling another witness when we

9     return?

10          MS. SCHNELLINGER:  No, Your Honor.  Thank you.

11          THE COURT:  Will the defense be calling a

12     witness when we return?

13          MR. BRYAN:  I need to make that determination,

14     but probably not, Your Honor.  I believe I got the

15     information I needed.

16          THE COURT:  Let's take 15 minutes.  Will that

17     give you enough time to assess whether or not to call a

18     witness?

19          MR. BRYAN:  Yes, Judge.

20          THE COURT:  We'll take a 15-minute recess, and

21     then return then at 11:15.

22          (Recess had.)

23          THE COURT:  We are now back in court and back

24     on the record.

25        Mr. Bryan, have you made a decision as to whether or

1      not to call a witness?

2                      MR. BRYAN:  Yes, Your Honor.  At this time we

3      will not be calling any witnesses.

4                      THE COURT:  All right, thank you.

5          With there then be no further presentation of

6      evidence?  Is that correct, on behalf of the government?

7                      MS. SCHNELLINGER:  Yes, Your Honor.  We would

8      just want to admit Government's Exhibit 1, which I believe

9      is identical to the exhibit admitted by defense counsel,

10     attached to their motion to suppress.

11                     THE COURT:  It certainly sounded that way.

12         Mr. Bryan, do you have any objection?

13                     MR. BRYAN:  No objection.

14                     THE COURT:  That exhibit is admitted.

15         So with that, then the Court will hear argument from

16     the parties.  Mr. Bryan, I will allow you to go first, it is

17     your motion, and then you'll have an opportunity to reply.

18                     MR. BRYAN:  Thank you, Your Honor.

19         Your Honor, the question at issue, there's actually a

20     couple of questions at issue, but the primary one is whether

21     or not Mr. James was in custody for purposes of *Miranda* at

22     any time, frankly, during this interview that lasted for

23     about 25, 26 minutes.

24         Actually the interview, according to the testimony,

25     lasted for a period of time prior to the recorded portion of

1     the interview, as the testimony we heard today from Special

2     Agent Johnston was that they interviewed him outside the

3     home for minutes, 10 minutes he testified to.  I'm not sure,

4     no one knows for sure exactly how long it was.

5                    THE COURT:  But would you agree that the

6     outside calculation appears to be approximately 35 minutes?

7                    MR. BRYAN:  If you include --

8                    THE COURT:  The in-home and the outside

9     portion, its greatest length appears to have been a

10    35-minute interaction.

11                   MR. BRYAN:  I would agree with that, Your

12    Honor.

13         And so then the case law is pretty clear on the issue,

14    but it's really sort of a fact-based determination, whether

15    or not someone is in custody for purposes of *Miranda*, as

16    compared to obviously we know it doesn't have to be an

17    actual arrest.  Mr. James was informed that he wasn't under

18    arrest, they didn't intend to arrest him, although those

19    things are part of the consideration.

20         But I would submit to Your Honor that when you look at

21    the totality of the circumstances, that not only did

22    Mr. James subjectively believe that if he didn't continue to

23    cooperate with law enforcement that he would be arrested

24    that day, but law enforcement led him to believe that as

25    well.

1          And they did so by telling him as long as -- his lack

2     of being arrested was as long as you're honest with us.  If

3     you're completely honest with us you are not going to be

4     arrested, and the agent testified that he admitted to

5     leading him to believe that.

6          So under those circumstances, Mr. James should have

7     been advised of his *Miranda* warnings at least at some

8     moments.  It didn't have to necessarily be at the very

9     beginning, but at periods of time where he was articulating

10    I don't want to be arrested, that should have been a cue to

11    law enforcement officers that he believed he was in custody,

12    that he didn't have the opportunity to stop the interview.

13         I think it is relevant also how law enforcement

14    handled the different phone calls from the mother, where

15    they basically told her to call his mother and then

16    intercepted the call and talked to the mother; and again,

17    admittedly it was maybe even with Mr. James' encouragement,

18    they sort of misled the mother about why they were there.

19         They didn't tell the mother exactly why they were

20    there.  They said it dealt more with attempts to harm

21    himself in the past and that there was some kind of a tip

22    that they were responding to.

23         So they gave the mother a ruse, and I would

24    acknowledge that was with Mr. James' encouragement as well,

25    because it was clear at that time that he didn't want his

1      parents to know that the FBI was there to interview him

2      about the Whisper app, which seemed to be his main concern;

3      which the evidence demonstrated was frankly the reason why

4      the FBI was there, because there was the undercover

5      communications with Mr. James on the Whisper app where there

6      were conversations about an 11-year-old pregnant girl that

7      were inappropriate, which would lead law enforcement to want

8      to interview the person involved in those conversations.

9           So, but I think it's important that just after they

10     hung up with the mother the father started to call, and at

11     that point in time law enforcement took a different tact,

12     and that was to ignore the call.  And even when the father

13     left a voice message demanding that Michael call him back

14     immediately or call him back now, they just blew right by

15     that.

16                    THE COURT:  I hear you on that point, Mr.

17     Bryan, but when you go back and you listen, that's at about

18     a minute and nine, I believe, 9:05, I could hear Mr. James

19     saying "I can call him later."

20                    MR. BRYAN:  Mr. James --

21                    THE COURT:  So he hears the dad and says to

22     the agents "I can call him later."  So what does the Court

23     do with that?

24                    MR. BRYAN:  You know, Your Honor, I'll be

25     honest, I didn't hear that as much as I heard that "Michael,

1      call me back now, call me back now."  And I would concede

2      that that's something that would reveal that Mr. James, like

3      with his mother, is willing to continue the conversation

4      without any intervention from his father.

5           But of course the agents were willing to do that as

6      well, and they were desirous of doing that as well.  Their

7      goal, notwithstanding what they were telling Mr. James at

8      the time, was to get him to provide information to them

9      which would amount to a confession.  Their other goal was to

10     be able to search the phone.

11          Now, I'm not sure why, based upon the information that

12     they gleaned from the undercover investigation, why they

13     didn't seek search warrants for Mr. James' telephone or for

14     any electronic devices prior to going there that day, but

15     the fact is they didn't.  So then they had to rely upon the

16     consent to search, and that's sort of the second aspect of

17     our motion, is that they sort of blew by the consent to

18     search process as well.

19          And so what the law is on that is that there has to be

20     a knowing intelligent waiver of his right, his Fourth

21     Amendment privileges to consent to the search of the phone

22     without him -- you know, a warrantless search of the phone.

23     And again, I think the agent, it's clear that he played upon

24     the ambiguity that Mr. James was experiencing at that time,

25     almost in an effort to sort of mislead him into waiving his

1    right not to consent to the search.

2         And it's clear that Mr. James, they're looking at his

3    phone at the same time, they're telling him we can't look at

4    your phone without you consenting to us looking at the

5    phone, but they're also leading him to believe that all they

6    are looking for is the Whisper application.  And once we

7    find that and once we purge that, that's what we're here

8    for, we're here to take that app away from you, and nothing

9    more.

10        And so I would argue that that's not an intelligent, a

11   knowing and intelligent waiver of his right not to consent

12   to the search of his phone, and based upon the fact that it

13   was a ruse, it was a ruse to basically get him to sign the

14   waiver.  I don't believe that they read it to him verbatim.

15   They told him to read it and then said words to the effect

16   like you can -- you don't have to consent if you don't want

17   to.

18               THE COURT:  Have you seen the consent form?

19   Has that been produced?

20               MR. BRYAN:  To be honest, Your Honor, I'm not

21   sure if it's been produced, but I don't recall seeing it per

22   se.  And the government hasn't made it an exhibit, so it may

23   exist, it may not.  I apologize, Your Honor.

24        But listening to the tape, it's clear that the

25   circumstances are, it's like, okay, let us look at your

1     phone, and if we find the app we can purge the app.  You

2     know, you're going to be okay as long as you're not lying to

3     us.

4          Again, everything is conditional, leading him to

5     believe that if he's not lying to them he's going to be

6     okay, so which is encouraging him to continue to cooperate

7     with them, which not only presents a situation where he

8     doesn't feel that -- he doesn't believe that he's not free

9     to cooperate with them, because even if they believe that he

10    is lying, the implication is that he could be arrested.

11         So that I think covers not just the requirement for

12    *Miranda*, but also undermines the consent, the voluntary

13    nature of the consent to search the phone, to look at the

14    phone.

15         And it's for those reasons that we believe not only

16    are his statements inadmissible because they should have

17    been Mirandized, but that the -- and you know, I guess

18    there's sort of a poisonous fruit argument from the *Miranda*

19    violation; but also even without the *Miranda* violation, that

20    the consent itself wasn't a proper consent because he was

21    misled into believing that they're just going to look at the

22    phone together, find the apps, get rid of the apps, and then

23    nothing else was going to come of it.

24         And that's particularly laid out by Mr. James, when he

25    says during that period of time, he says, "Look, this is

1    only related to this investigation," which in his mind was

2    they were there about the Whisper app.  So what he thinks

3    that they're doing is looking for the Whisper app, letting

4    them look at the Whisper app and, quote, this is the agent's

5    words, to purge, to purge the app from the phone, and then

6    everyone will be on their way.

7                   THE COURT:  Setting aside the purge comment,

8    when consent is given, and this is where I'm trying to

9    follow your argument that consent was limited just to the

10   Whisper app, when consent is given and there's a form that's

11   given for consent, or even if consent is given to search a

12   home without a form or it's given to search a car, is it

13   your argument that the individual who gives consent has to

14   give consent to every conceivable law enforcement step?

15        So by that I mean if consent is given to search a car

16   and narcotics are found inside or a gun is found inside,

17   it's your argument that he would also have to consent to the

18   submission of the suspected narcotics to a lab or the

19   analysis of the gun for interstate nexus?

20        I mean, consent as I understand it, unless you have

21   authority to direct me otherwise, does not require

22   step-by-law law enforcement investigative step.

23                   MR. BRYAN:  No, I don't believe it does, but

24   the law does require that consent must be knowing,

25   intelligent, and voluntarily given, and so it's those three

1    words he was I think misled to believe he was consenting to

2    them looking with him at his phone.  I don't believe at that

3    juncture he believed they were going to seize his phone and

4    take it from him.

5         I think what's clear from when you go through that,

6    through that transaction, is he's coming to look at his

7    phone and he says "Before I can look at your phone you have

8    to give me consent to look at your phone," and so he pulls

9    out the waiver, and they sign the waiver and everything; and

10   if Mr. James didn't say "This is only related to this

11   investigation," meaning looking for the Whisper

12   conversations, then I think I would have a weaker argument

13   in this regard.

14        But it's clear to me that under what they were doing

15   was misleading him into believing that they needed him to

16   sign written consent to basically look over his shoulder,

17   that he didn't realize that he was consenting to the full

18   search of his phone, as somebody who consents to the search

19   of their car.  They know when they give the police consent

20   to search the car that the police are going to search the

21   whole car, or if they give consent to search the house that

22   the police are going to consent -- or that the police are

23   going to search the whole house.

24        But what appears to be happening from this

25   interaction, and I'd invite the Court to go back and listen

1    to it again, is that they're coming to look over his

2    shoulder at the phone to look for the Whisper app, and

3    they're leading him to believe that we need written consent

4    before we can even look over your shoulder, which frankly

5    they would have needed consent or a warrant before they

6    could have even looked at the phone in that way.

7         But that was misleading.  He didn't realize he was

8    consenting to the entire search of his phone.  And they

9    never told him that, and they never said we're taking your

10   phone, or anything like that.  They even told him "I need

11   the password so we can get into the phone," that kind of

12   thing.

13        So I think it's a fine line, but as going back to the

14   *Miranda* argument, I think just to summarize, it's clear that

15   Mr. James believed that if he wasn't cooperating with the

16   FBI that he was in risk of being arrested.  They didn't

17   allay that fear by telling him, no, we're not going to

18   arrest you today.  They made it conditional.  They said, as

19   long as you're not lying to us you're not going to be under

20   arrest.  So them making it conditional basically put him in

21   a situation that was custodial, which would have required

22   the *Miranda* warnings.

23        And then as it relates to the consent of the search of

24   the phone, it didn't qualify as a knowing, intelligent, and

25   voluntarily-given consent because of the manner in which

1      they approached him to look at the phone first and then

2      later seize the phone.

3            Thank you.

4                      THE COURT:  Thank you, Mr. Bryan.

5            Ms. Schnellinger.

6                      MS. SCHNELLINGER:  Your Honor, would we be

7      able to have a side-bar, please?

8                      THE COURT:  Certainly.

9                      (Proceedings at side-bar:)

10                     MS. SCHNELLINGER:  I apologize.  Maybe I'm

11     missing a motion.  Was there a supplemental motion filed

12     that I didn't see?

13                     MR. BRYAN:  No.

14                     MS. SCHNELLINGER:  So there was only the one

15     motion to suppress --

16                     MR. BRYAN:  Yes.

17                     MS. SCHNELLINGER:  -- on his mental health.

18                     MR. BRYAN:  It wasn't really on his mental

19     health.

20                     THE COURT:  It was on custodial and it was on

21     mental health.

22           This argument, I will say, does appear to be outside

23     of the briefing that was submitted.  The briefing challenged

24     whether or not it was custodial, to be certain, and whether

25     or not the police were in some way coercive and overboard in

1   light of mental health conditions.

2        Then there was the third point, which was the fruit of

3   the poisonous tree.

4        This issue of whether or not consent was properly

5   given, whether or not the government has had an opportunity

6   to fully assess the knowing, intelligent, and voluntary

7   aspect of the waiver or the consent to search, that was not

8   briefed.

9        Do you want to take a minute to look at your brief?

10            MR. BRYAN:  No.  I remember the brief.  I know

11  we addressed the waiver in the brief.

12            MS. SCHNELLINGER:  The waiver of what? I'm

13  sorry.

14            THE COURT:  The consent to search.

15        I think I said it wrong.

16            MS. SCHNELLINGER:  The consent to search was

17  not addressed in the brief at all.

18            MR. BRYAN:  We did.  We addressed it.

19        I think I'm --

20            (Pause in proceedings.)

21            THE COURT:  So the first section, subsection

22  A, addresses the custodial nature of the search; B, the

23  exploitation of his mental condition under *Connelly*.

24        Here, the interview was coercive, knew about his

25  mental health history through Michael's statements, asking

1    why he had ceased taking his medication, interfered with

2    memory.  Mental health history, not in his right mind, in

3    response to their questions about his past behavior.

4         And then there's the fruit of the poisonous tree, thus

5    the confession -- I guess actually here it is, at the very

6    end, you may see it yourself, thus the confession and

7    consent to search should be suppressed.

8                   MR. BRYAN:  Right.

9                   THE COURT:  It is not a developed argument.

10                  MR. BRYAN:  I understand that.

11                  THE COURT:  But I guess it is --

12                  MR. BRYAN:  That's what I was --

13                  THE COURT:  -- but it was present.

14                  MS. SCHNELLINGER:  But you're right, it does

15   need to be developed argument that I can respond to.  You

16   are saying because he's custodial and mental health.  That

17   is completely different than the argument you've made today,

18   because you're saying fruit of the poisonous tree.  It is

19   different.

20                  MR. BRYAN:  That's fruit of the poisonous tree

21   is in addition to --

22                  THE COURT:  The whether or not he could

23   effectively consent, though, you premised on his mental

24   health condition.

25                  MS. SCHNELLINGER:  The defense didn't mention

1    his mental health at all during his argument today.

2              THE COURT:  I mean -- what is the

3    government -- what is the government asking at this point?

4              MS. SCHNELLINGER:  At the minimum, I get an

5    opportunity to fully brief this after it's been fully

6    briefed by the defense; but truthfully, we are at a motion

7    to suppress, it has not been developed.  This has been

8    sprung on the United States, and it shouldn't be allowed at

9    this point.

10             MR. BRYAN:  Well, we're just setting up a

11   future issue for the client.

12        I don't object to briefing that issue, Your Honor.  I

13   think some of it was inspired by the testimony.  I think the

14   issue developed more strongly during his testimony, and it

15   was really sort of just by listening to the tape, and the

16   answers to some of the questions during the testimony.

17        So I'm happy to submit like a post-hearing brief on

18   the issue so it can be addressed by the government, as well.

19             MS. SCHNELLINGER:  I'm not happy.

20        I think if the Court feels that this may alleviate

21   future problems down the road, I think a completely

22   different motion to suppress needs to be filed and we have

23   the opportunity, because this is all mental health.

24             MR. BRYAN:  No.

25             THE COURT:  But based on what you've heard

1    though, what do you feel you need to brief?

2             MS. SCHNELLINGER:  I need to brief whether or

3    not there was a voluntary waiver to consent form.

4             THE COURT:  But based on what you've heard

5    here, you feel you can't respond to that?

6             MS. SCHNELLINGER:  I can respond to that, but

7    he's also saying he's never even seen the consent form,

8    which he has, which he has in discovery.

9             MR. BRYAN:  I just -- I'm not denying we

10    received it; just off the top of my head --

11             MS. SCHNELLINGER:  I guess I can present that,

12    I can brief it.  But if I feel the need to present more

13    evidence I'd like to have that opportunity, because you're

14    asking me basically -- this is a completely different

15    avenue.

16             THE COURT:  Well, the consent is referenced

17    even with respect to mental health.  It is.  And admittedly

18    it is one sentence at the end of subsection B, but the

19    confession and consent to search are both referenced.

20       I'm going to accept the argument -- I understand we're

21    at the suppression stage, but this is a potential

22    Constitutional deprivation, and the Court will hear argument

23    on it.

24       What I need to understand is whether or not you really

25    think you need time to brief it, which counsel is obviously

66

1     not opposing and would want the same opportunity, or do we

2     just hear argument today.

3                      MS. SCHNELLINGER:  Your Honor, I don't want to

4     delay the Court at all, but I do need time to brief that

5     issue because I can't argue that today with case law, or I

6     don't even have a printed consent form for the Court.  I

7     have the consent form, but I can't provide it to the Court

8     at this second.  So I would like time to brief it, because I

9     feel like his argument is very different than his motion.  I

10    haven't heard mental health referenced at all during his

11    argument.

12                     THE COURT:  Mr. Bryan?

13                     MR. BRYAN:  I mean, it was developed during

14    cross-examination about him being on meds.  And so I agree I

15    didn't really argue it on my off-the-cuff argument that I

16    just made as related to his mental health, but I do believe

17    under *Colorado v. Connelly* that they should have perceived

18    that he had mental health issues that made him more

19    vulnerable to the interrogation process, or they should have

20    taken it into consideration alone.

21         I stand on what we briefed, and I do agree that the

22    waiver, the signed waiver wasn't fully developed in the

23    brief, but I think we did argue it in the sense to the

24    extent that he was incapable of making an intelligent

25    voluntary waiver, not just because of his mental illness,

1    but because of the -- and I'll be honest, it's sort of how

2    the evidence developed during the hearing itself.  I guess

3    it was the benefit of the hearing.

4                    THE COURT:  Well, to an extent.  You knew the

5    consent form was an issue, because you realize this

6    particular argument could have been presented in the initial

7    briefing.

8                    MR. BRYAN:  Right.

9                    THE COURT:  The issue now is what to do.

10   Present it to the Court today, which the government is

11   saying they object to, or to conclude the hearing with the

12   Court making no findings, and giving an opportunity for a

13   limited submission specific to the consent itself, and

14   whether it was knowingly and intelligently and voluntarily

15   given on July 1st.

16                   MR. BRYAN:  Right.

17                   THE COURT:  That would be the very limited

18   additional briefing the Court would accept.

19                   MR. BRYAN:  And I'm not opposed to that at

20   all.  We kind of sort of created the conundrum.

21                   THE COURT:  All right.  Again, this is a

22   Constitutional deprivation.  I hear the government's point,

23   but the Court is going to have to hear it in some fashion,

24   but in a way that gives everybody an opportunity to fully

25   address it, and the Court frankly will fully evaluate it.

1          I am going to give the time requested.  How much time?

2     I would think that the government would be the first to

3     file, and then the defendant could reply at this point,

4     given all the information that's been presented, and you

5     heard the argument.

6               MS. SCHNELLINGER:  If I have a week and a

7     half, because if I ask for the transcript, I'm responding to

8     his argument, and it's solely on the consent.

9               THE COURT:  It is solely on whether the

10     consent to search the phone that was provided on July 1st,

11     2024, was knowing, intelligent, and voluntary, or whether it

12     was limited to the Whisper application as Mr. Bryan has

13     suggested.  It's really that is what it's limited to.

14          And Mr. Bryan is nodding his head in agreement.

15               MR. BRYAN:  That is correct.

16               MS. SCHNELLINGER:  Okay.  A week and a half,

17     Your Honor, would be fine.

18               THE COURT:  And how much time after that?

19               MR. BRYAN:  Just a week to respond.

20               THE COURT:  I can't do the dates off the top

21     of my head, but I will impose dates that mirror that

22     timeline, and we will proceed.

23               MR. BRYAN:  We're not submitting briefing on

24     any of the other issues.

25               THE COURT:  No.  Now is your time to argue

1    what has been -- that is the only limited issue that

2    remains.  So I will hear argument on the other matters now,

3    and then you'll have an opportunity to reply --

4                    MR. BRYAN:  Yes, Your Honor.

5                    THE COURT:  -- to the government's argument,

6    and then we'll do written submissions on that very limited

7    issue.  Understood?

8                    MS. SCHNELLINGER:  Yes, Your Honor.

9                    THE COURT:  Understood?

10                   MR. BRYAN:  Yes, Your Honor.

11                   THE COURT:  Thank you.

12                   (Proceedings had in open court:)

13                   THE COURT:  Ms. Schnellinger.

14                   MS. SCHNELLINGER:  Thank you, Your Honor.

15   Thank you for the opportunity.

16        Your Honor, as the Court is aware, the motion to

17   suppress that was filed was regarding custody and whether or

18   not Mr. James was in custody during this interview.

19        As the Court has the Government's Exhibit 1, which is

20   the same as defense's supplement to the motion to suppress,

21   throughout the entire discussion with Mr. James they tell

22   him "You're not going to jail."  And in fact, at one point

23   Special Agent Johnston states "The only way you're going to

24   jail if is if there's an 11-year-old tied up in the

25   basement," and Mr. James actually laughs.

1           There was reference to the parents calling regularly.

2    I don't know what bearing that has on whether or not he's in

3    custody at all, Your Honor.  He's a 28-year-old man with a

4    full-time job.  He just happens to live with his parents.

5    And the fact that they were calling regularly, there's no

6    case law that states if parents are calling and the

7    defendant decides not to answer, that that's an issue.

8           In fact, he had multiple times that he could have

9    answered and chose not to.  At one point he says he'll text

10   his mom.  At one point he said he'll call them back.  The

11   only reason he did answer was at the encouragement of

12   Special Agent Johnston.  And Attorney Bryan is right that he

13   encouraged -- Mr. James encouraged and requested Special

14   Agent Johnston to lie to his parents.

15          Mr. James may or may not have mental health issues.

16   He definitely was nervous throughout this, he definitely

17   became upset through this interview, and that's not unusual,

18   especially when there's discussions about whether or not you

19   did something of this nature.  He does become suicidal at

20   the end or at least he makes suicidal ideations, and that

21   was after he had already confessed.

22          There is significant case law that states that if an

23   interview is done in a defendant's home that's almost

24   dispositive, but not completely, but almost, and there has

25   to be some kind of coercive actions by the agents.  I did

1   ask repeatedly did you ever show your firearm, did you ever

2   show your handcuffs, were there multiple agents there, and

3   it was just the two agents that are sitting beside me.

4        They sat away from him.  He was able to see the door.

5   At no point did they make any aggressive movements toward

6   him at all.  And whether or not Mr. James had mental health,

7   there has to be something more.  There has to be another

8   step by the agents to use that to make the interview

9   custodial, and they didn't use his mental health against

10  him.  They were calm, they were quiet, they were reassuring.

11  And I don't think there's any merit to this argument

12  regarding mental health.

13       There was several statements about if you're honest

14  with me you're not going to go to jail, but clearly from my

15  redirect Agent Johnston stated he wasn't honest.  He wasn't

16  honest.  There was a second interview where he told the

17  truth.  So he never even told the truth during that

18  interview, so how did they overbear his will to the point

19  that he believed I've got to be honest or I'm going to jail.

20  He wasn't honest.

21       So I think the Court should take that into

22  consideration as well.  But again, we have a 28-year-old

23  defendant here, and there's been no showing of -- there's

24  really been no showing of mental illness that would impair

25  his ability to have a discussion with these agents and

1    conduct an interview in his house.

2         And I go back to the same case law that defense cites,

3    so regarding -- I'm forgetting the first name -- *Connelly*.

4    I'm sorry, Your Honor.

5                   THE COURT:  That's all right, I know exactly

6    what case.

7                   MS. SCHNELLINGER:  Thank you.

8         There are a lot of things that go into this, and when

9    you look at the whole totality of the circumstances it's

10   just not there.  And I would ask the Court to consider the

11   totality of the circumstances, and not just piecemeal the

12   interview.  We consider the entire interview where the

13   agents were very clear he wasn't going to jail unless he has

14   an 11-year-old tied up in the basement.

15        Thank you, Your Honor.

16                  THE COURT:  And just for point of

17   clarification, it's the Court's understand at this point

18   that with respect to any mental health medication, that is

19   what Mr. James had identified as interfering at times with

20   perhaps, as he states, his ability to understand or recall

21   things, but that he had in fact stopped taking that

22   medication before July 1st of 2024.

23                  MS. SCHNELLINGER:  Yes, Your Honor.

24        And to add to that, that medication also made him

25   angry, so that was another reason he stopped taking it.  And

1    he stated that his mental health was his anger issues and

2    depression, but he never stated throughout the interview

3    that he was feeling those symptoms during that.  He actually

4    separated it out and he said when I'm angry and depressed I

5    do these things.  He wasn't saying he was angry and

6    depressed during the interview.

7           Thank you.

8                  THE COURT:  Thank you.

9           Mr. Bryan.

10                 MR. BRYAN:  Your Honor, I think it's clear

11   from the evidence, and not just the exhibit of the interview

12   but also the agent's testimony, which he acknowledged, that

13   Mr. James was articulating a fear of being arrested, and

14   that the agent articulated back to him that -- a conditional

15   answer to that concern, and that was you won't be arrested

16   as long as you're telling the truth, as long as you tell us

17   the truth.

18          It doesn't matter if Mr. James told him the truth or

19   not.  He wasn't told unequivocally that he was not in

20   custody.  He was led to believe that if he didn't continue

21   in his cooperation with them, continue talking to them, and

22   not only continue talking to them but providing truthful

23   information to him, there was always a chance that he could

24   be arrested.

25          And so based upon those circumstances, the totality of

1    those circumstances, this was such an inherently coercive

2    environment that would have necessitated the *Miranda*

3    warnings as based upon the law.

4        So for those reasons we believe the Court should grant

5    the motion to suppress, and not only Mr. James' statements

6    but also the fruits of his statements as it related to the

7    seizure of the phone.  And of course, we have additional

8    argument to be made regarding whether or not he consented to

9    the search and seizure of his phone.

10       But just on the main issue as related to whether or

11   not he was in custody, it's sort of incumbent upon the law

12   enforcement officer to not play on that ambiguity, and they

13   did just that.  They played on the ambiguity.

14       Mr. James' firm belief was that he could be arrested,

15   and when you say, well, you're not going to be arrested as

16   long as you tell us the truth, that implies that you need to

17   continue to talk to us; that there's a very strong

18   implication that if they said we're not going to arrest you

19   at all, whether you tell us the truth, whether you don't

20   tell us the truth, whether you don't talk to us at all, that

21   would be a noncustodial situation; but by playing on his

22   fear of being arrested, they turned what could have been

23   noncustodial into a custodial situation.

24       Thank you.

25            THE COURT:  All right, thank you.

1          As you referenced, Mr. Bryan, during the course of

2     this hearing you raised an argument that had not been fully

3     developed or even raised with any particularity in the

4     opening brief, and that is whether or not Mr. James

5     knowingly, voluntarily, and intelligently consented to

6     execute the search warrant and consent to the search of the

7     phone; and if so, whether or not it was in some way limited

8     to the Whisper application.

9          I'm going to assume this is a one-off, Mr. Bryan, and

10    that this failure to raise this in a way that would have

11    given us all an opportunity to address it today is just a

12    one-time mistake, but it is a Constitutional deprivation,

13    and the Court believes that there's enough information now,

14    facts anyway in the record now, to appreciate what it could

15    mean.

16         But the government has asked for time to brief the

17    issue with the benefit of research and the transcript in

18    this case, and the defendant has indicated that there's no

19    opposition to that request.  And so the government will

20    submit a brief addressing that very limited argument, the

21    consent, whether it was knowing, voluntary, and

22    intelligently given, and whether or not there's any credence

23    to the fact that it is somehow limited to the Whisper

24    application.

25         The deadline for submitting that, the government had

1   asked for about a week and a half.  There is some time, so

2   the brief for that, I want to take into account that there

3   is a day for Martin Luther King, Jr. recognition, so that

4   holiday expends it to July 27th, the date of the

5   government's opposition.  All right?

6                MS. SCHNELLINGER:  Did you mean January 27th?

7                THE COURT:  Yes, I did.  I'm sorry.  Thank

8   you.

9        January 27th.  And then February 3rd, so a week after

10   that, Mr. Bryan, would be the response from you.  All right?

11               MR. BRYAN:  Yes.  Thank you, Your Honor.

12               THE COURT:  And then the Court will rule on

13   the paper.  This obviously necessitates a continuation with

14   respect to the final pretrial and the trial date.  When a

15   motion to suppress is under consideration 3161 allows for

16   additional time.  The clock is certainly tolled.

17       When the Court rules, if there are matters to address

18   the Court will get everybody on the phone for a pretrial

19   conference to schedule additional dates as needed.

20       Is it my understanding that there are additional

21   statements given post-arrest by the defendant?

22               MS. SCHNELLINGER:  Yes, Your Honor, there was

23   another statement given post-arrest in custody.

24               THE COURT:  All right.  And that's not being

25   challenged, so -- Mr. Bryan?

1           MR. BRYAN:  Correct.  Your Honor, that

2    statement was *Mirandized*.  I don't know if the argument

3    would be that if he didn't make sort of the fruit of the

4    poisonous tree moving forward, but I'm not challenging those

5    statements based upon any failure to advise of rights or

6    coercion, or anything of that nature.

7           THE COURT:  Right.  There's been no challenge

8    raised to that statement.

9         So the Court will take the matter under advisement

10   after this new argument has been fully briefed.  It will

11   rule, and then it will immediately get on the phone with

12   counsel to schedule dates as appropriate.

13        Are there any other matters -- is there a phone

14   ringing?

15           MR. BRYAN:  I believe it's ringing in my coat,

16   Your Honor.  I apologize.

17           THE COURT:  At this point we've pretty much

18   concluded.

19        Is there anything else to address at this time, Miss

20   Schnellinger?

21           MS. SCHNELLINGER:  No, Your Honor.  Thank you.

22           THE COURT:  Mr. Bryan?

23           MR. BRYAN:  Nothing further.  Thank you,

24   Judge.

25           THE COURT:  We're adjourned.

1                          -  -  -  -  -

2          (Proceedings adjourned at 11:55 a.m.)

3

4

5

6                    C E R T I F I C A T E

7

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11               /s/Heidi Blueskye Geizer_____January 16, 2024

12               Heidi Blueskye Geizer                    Date
                 Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25