UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:24-cr-341 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cleveland, Ohio |
| | ) | Thursday, February 13, 2025 |
| MICHAEL MONROE JAMES, | ) | 9:18 a.m. |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE BRIDGET M. BRENNAN,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: **Toni Beth Schnellinger Feisthamel, AUSA**
U.S. ATTORNEY'S OFFICE - AKRON
2 South Main Street
208 Federal Building
Akron, OH 44308
330.352.0993

For the Defendant: **Edward G. Bryan, AFPD**
FEDERAL PUBLIC DEFENDER'S OFFICE
1660 West Second Street
750 Skylight Office Tower
Cleveland, OH 44113
216.522.4856

Official Court Reporter: Gregory S. Mizanin, RDR, CRR
United States District Court
801 West Superior Avenue
Court Reporters 7-189
Cleveland, Ohio 44113
216.357.7036
Gregory_Mizanin@ohnd.uscourts.gov

Proceedings recorded by mechanical stenography; transcript produced with computer-aided transcription.

THURSDAY, FEBRUARY 13, 2025

(Proceedings commenced at 9:18 a.m.)

THE COURT: We're here today for the resolution of the motion hearing that was started earlier and paused for some additional briefing.

Before the Court is Mr. James' motion to suppress.

Mr. James is present, as is his attorney, Mr. Bryan.

Counsel for the government, Ms. Schnellinger, is also present here in court.

To resolve the motion -- that's Document Number 18; the government responded at Document 24; and Defendant replied, Document 25 -- an evidentiary hearing was held on January 14th. FBI Special Agent Austin Johnston testified; he was the only witness to testify. Mr. James elected not to call any witnesses.

During argument, the government requested additional time to address in briefing Mr. James' assertion that his consent was limited -- if he gave consent, it was limited to an application on his phone. The Court permitted both parties the opportunity to submit supplemental briefing on the issue. This is one where -- this issue is one where the government bears the burden of proof, so the government filed its submission first, Document 29. And then Mr. James filed a responsive brief on the 30th.

Having reviewed the briefing, having presided over the

evidentiary hearing, and having the benefit of also reviewing the transcript, the Court is prepared to rule on the motion.

Any objection to the Court ruling at this time, or is there any additional evidence to present, on behalf of the government?

MS. SCHNELLINGER: No objection, Your Honor.

THE COURT: Mr. Bryan?

MR. BRYAN: No, Judge.

THE COURT: Thank you.

The Fifth Amendment provides that no individual can be compelled in any criminal case to be a witness against himself; and to safeguard this constitutional right, law enforcement officers must give what are called Miranda warnings before any custodial interrogation. Miranda warnings include notifying the individual of their right to remain silent and to have counsel provided or appointed for them, if necessary, to be present during questioning.

Mr. James argues here that this was a custodial interrogation and he should have been advised of his rights. The failure to do so, he urges, warrants suppression of his statements.

On July 1st of 2024, he also challenges consent to the search of his cellular phone. And to the extent he consented, he asserts that it was limited simply to the

Whisper application.

Speaking first to the interview, the ultimate inquiry for the Court is whether, on July 1st of 2024, a reasonable person would have believed a formal arrest or something akin to a formal arrest occurred. The Court considers the circumstances of the interview to determine how a reasonable person in Mr. James' situation would understand their freedom of action or inaction. The subjective impressions of Mr. James or the agents who were present that day is not considered.

The Sixth Circuit recognized, in *United States versus Lawrence*, that the defendant bears the burden of proving by a preponderance of the evidence that he was subjected to a custodial interview and was -- should have been given Miranda warnings.

The factors to consider in assessing whether an encounter was custodial are laid out in *United States versus Panek*. This is both -- this case is referenced by both parties in the briefing. The four factors to consider are: The location of the interview; the length and manner of questioning; any restraint on limitation; and whether there are any statements made about the person's -- in this case, Mr. James' -- ability to decline to answer questions or conclude the interview.

Starting with the first factor, all parties agree the

interview happened at Mr. James' home. At-home interviews are usually not considered custodial, largely because a reasonable person in their own home environment typically feels less restriction, even in the presence of law enforcement. This is recognized in *Hinojosa*. But in-home interviews can still become custodial, and Defendant argues this point. To determine if such an in-home home interview became custodial, the Court must consider four things: The number of officers present; any show of authority; displaying or drawing of weapons; or the nature of the question.

I will say the Court finds Special Agent Johnston to be a credible witness for several reasons, including his many years of experience, his responsiveness to the questions presented here in court, but also that he was corroborated by the recording. He testified to all of these four points.

So, first of all, there were only two officers present. There was a minimal show of authority. They arrived at Mr. James' home in an unmarked car. They were wearing street clothes; no handcuffs or weapons were visible or displayed. They rang the doorbell and spoke to Mr. James' father through a Ring doorbell and then spoke with Mr. James directly when he came to the door. They stepped away from the door for a short time -- and this is

not part of the recording, but they stepped away from the door for a short time. And when they revealed to Mr. James what the nature of their questions would be, they all agreed to go someplace else, namely inside the home so that Ring cameras wouldn't capture their conversation.

Once inside, the officers asked where they could sit down. This is captured on the recording. Mr. James sat on the couch, and the officers -- agents sat nearby.

At a later point in the interview, you can even hear Special Agent Johnston ask Mr. James if -- when they're going through the phone, if he can actually move closer to him. So based on that, the Court concludes that the space between Mr. James and the agents -- so Mr. James' physical space was not infringed on in any particular time.

This question about moving closer occurs at approximately 24 minutes and 35 seconds on the recording, questioning is conversational to -- to be sure -- and Mr. James makes this point -- there were numerous calls coming in from his parents during the course of the interview. As calls are coming in at times, Mr. James identifies the caller at one point, he even speaks with his mother. In doing so, he's somewhat forceful in tone; not disrespectful, but he's very clear in how he wants to share information with her. He sounds confident. He does not disclose the full nature of the interview with her, and, as

an adult, he did not have to.

Special Agent Johnston then offers to speak with her. And this is a notable point because at this point, the defendant begins to direct Special Agent Johnston in what he can or should say to Mrs. James. That he felt comfortable enough to instruct federal agents on what they could say to his mother undercuts a finding that he was being asked questions in a setting that limited his freedom of movement or somehow akin to arrest. And later, at approximately 7 minutes and 57 seconds, his father is calling, and the defendant just says, "I can call him later."

He's not being prohibited from talking to anyone. In fact, he has asserted control over what information is shared with his parents and when. This occurs early on in the interview, and then it's heard -- it's captured again later in the interview when his mother arrives home.

When listening to the nature of the questioning, it's calm, it's patient, it's conversational. Mr. James answered promptly and comfortably at first. As the interview went on, he did become more upset, which is understandable, but he did slow in his responses, sometimes even speaking over the agents or anticipating the agent's question and providing an answer before the question was complete. He does not sound intimidated. He does not sound as though he does not have some sense of understanding of what's going

on. And in the totality of the circumstances, certainly this weighs in favor of a noncustodial finding.

But there was testimony about being arrested and purging the Whisper application. When listening to the interview as a whole, the Court finds that Special Agent Johnston was clear overall that an arrest would not occur that day. Special Agent Johnston says at approximately Minute 20, "We told you already, you're not going to jail today." And the response from Mr. James was, "I know, I know."

And then the clearest statement provided was about a minute later when Special Agent Johnston says, "You'll only be arrested today if I find an 11-year-old in your basement." So they are reinforcing throughout the interview that Mr. James is not going to be arrested.

There was no limitation on his movement. And as I already found, he has no limitations on who he could communicate with. In fact, he determined who he communicated with and what.

The final factor, whether he was told he did not have to answer any questions, as *Panek* notes, this is not a requirement. The Sixth Circuit returned to this finding in *Fein* in 2021. It can be a factor in close cases, but it's not -- it's not a factor here. This is not a close case. The interview was at Mr. James' home. Everyone including

Mr. James remained calm and respectful throughout. He is a 28-year-old man, educated beyond high school, and employed in managerial positions. And the agents' conduct throughout was not such that any show of authority was at all in play. That means there's some authority when somebody finds or announces that they are an FBI agent or a task force officer with the FBI, but that's not enough here to find that this was a custodial situation.

I will say that, you know, like in *Panek*, the defendant here fails to identify circumstances that transformed his home into some sort of interrogation space. *Panek* collects a series of cases that find the opposite, where in-home interviews can in fact have been custodial interrogations. But this case doesn't present the same facts in those collected cases.

Again, two officers in street clothes, no weapons drawn, the interview was during workday hours, not early morning hours as -- as settled at the last hearing. The outside length of this particular interview was 35 minutes, and that includes the short meet-and-greet that occurred outside and was not recorded. There are assurances that no arrests would be made -- instructions that he gave the agents about what to say to his mom. This all leads the Court to find that, for these reasons, the circumstances of the interview were such that a reasonable person would have

understood their situation, that they would have understood that they were not under arrest or limited in any way from terminating questioning or asking the agents to leave. So the July 1st, 2024, interview was not a custodial interrogation.

I do want to take a moment, before going to the consent issue, just to address mental health. This was raised in the briefing.

And, Mr. Bryan, I recognize that you maintain this challenge. It was not really developed during the evidentiary hearing, but with the benefit of the timeline that Mr. James provided during the interview and obviously the benefit of the recording, the Court can address this as well.

"Statements can be considered involuntary if police activity was objectively coercive, was of a nature to overbear the defendant's will, and the alleged law enforcement conduct was a crucial motivating factor in the defendant's decision" -- this is *Fein* and also *Luck*, both Sixth Circuit cases -- "At bottom, coercive police activity is necessary to find a confession was not voluntary."

Here he raises his mental health condition. It appears, from what the Court knows, that this is a condition that causes him to be angry or depressed.

There is a reference to medication. It's never stated

what was prescribed, but critically at the time of the interview James advises the agents that he's not on the medication and he stopped taking it because it made him angry. So the complicating factor is the medication, which he was not on on July 1st of 2024.

And in listening to the interviews, he's clear in his responses; he's timely in his responses; he's anticipating questions. While he sounds upset, he does not sound angry; he is in fact polite and courteous and respectful with the agents throughout. He does deny remembering Whisper app conversations at times but expresses no other possible limitation on memory or ability to understand what's happening.

So there's no coercive conduct on the part of the agents for the reasons already stated. The recording captures a calm conversation between three adults. There's nothing overbearing.

And importantly, even in *Garner*, the court noted that if the agents don't have a reason during the conversation to think that the interviewee or the subject cannot understand or is presently suffering from a mental condition then, quote, "there is nothing that smacks of abusive behavior," unquote. So the Court heard nothing of that nature and does not find that Mr. James was suffering from any mental condition that would prevent his ability from understanding

the interview but also sort of understanding the consent that he gave with respect to his phone.

"Moving to that portion, when a defendant challenges consent, it's the government's burden to prove by a preponderance of the evidence that the consent was knowingly, voluntarily, and intelligently given, and is not contaminated by any duress or coercion." This is *United States versus Hudson*.

The standard -- and both parties recognize the standard in *Jimeno* -- the Supreme Court found the standard for measuring the scope of consent is objective reasonableness; so what would a typical person have understood given the exchange that occurred between them and the officers?

And the Court has two critical pieces of evidence in this regard. The first is the audio recording, and the second is the consent form attached to government's submission, Document Number 29.

So in the audio recording, other applications were also mentioned. Defendant takes the position that if consent was given, that it was only to the Whisper application.

So with respect to other applications, there were several other applications that were mentioned and discussed during the course of this interview.

At Minute 11, Special Agent Johnston asks, "If I'm on your phone, is there anything else you use, like Whisper?"

And Mr. James mentions Snapchat -- this is approximately 11 minutes and 24 seconds -- and James then says -- Mr. James says that they can check his Snapchat.

At approximately Minute 12, James -- Mr. James can be heard saying that his iPhone is an iPhone 15 Pro Max. That description of his phone matches what's later written on the consent form. And the Court will get to that in a moment.

At Minute 12:10, Mr. Johnston states that the only form Mr. James is being asked to sign is a consent form to search.

And then I do hear Mr. Johnston -- or Special Agent Johnston say, "The Whisper, et cetera." This was a point of contention during the course of the evidentiary hearing, but upon listening to the recording, I can hear that the statement to Mr. James was, quote, "The Whisper, et cetera," end quote.

Special Agent Johnston states the search is of that particular phone. And this is where it -- the audio captures a discussion about the form itself. He shows and explains the terms of the form and states it is related to his conversation investigation. To be sure, Mr. James asks for clarification that it's only related to this, and he is told that it is, and Mr. James signs the form.

Telegram is discussed at approximately 16 minutes and 10 seconds; Discord is mentioned approximately 10 to 11 seconds after that even.

And then at 17 minutes and 18 seconds, Special Agent Johnston asked: "If we go through your phone, is there anything else we should know about ahead of time?"

And at this point what's critical for the Court is Mr. James does not mention or act in any way surprised that they could be going through the phone. The consent form has already been signed and addressed, but he does not retract his permission. This is likely because, you know, Mr. James had already signed the consent form and knew he had given permission for the entirety of the phone.

The government mentions comments about Megalinks and Telegram. Megalinks isn't mentioned until Minute 21. And then shortly after that, Mr. James recognizes that Telegram probably goes hand in hand with Mega.

These references are after the form was signed and after the special agent inquires about the phone; but again, as this conversation is going, Mr. James has signed a form recognizing he has given permission for the entirety of the phone. He doesn't act at all surprised that these issues are coming up, and he doesn't retract permission to use the phone or to search the phone.

The second important piece of information is the form

itself. So it's typed out at the top of the form: "I have been asked by special agents of the Federal Bureau of Investigation to permit a complete search of" -- and then written underneath it, there's the number "1" and then "iPhone 15 Pro Max S/N" -- so serial number -- "KHM95C7DYQ."

And underneath the handwriting are additional typed notations, and they include the following. I think number 2 is: "I have been advised of my right to refuse consent."

The next one is: "I have given this permission voluntarily."

And the final one is: "I authorize these agents to take any items which they determine may be related to their investigation."

And Mr. James signed the form.

Again, Mr. James is educated. He's demonstrated employment. And not just any employment, he has been promoted to supervisory positions. He certainly can understand the nature and contents of the form. But, again, the audio captures that the form is in fact explained to him. It also captures Special Agent Johnston expressly stating "Whisper, et cetera." So I do not find that the argument that it was limited is persuasive. In fact, even before Mr. James offers his consent to the search of his Snapchat even -- and that he even acknowledges is something that he uses to communicate with others. So the

conversation investigation then certainly includes more than just Whisper.

The entirety of the audio reveals that the investigation extended beyond Whisper. As I indicated, there are other applications mentioned throughout the course of the interview.

And when asked if Special Agent Johnston would find anything else on the phone, Mr. James did not say, you know, "Well, you're only looking at Whisper," or he did not say, "I'm no longer giving you permission to search the phone." And the consent form is patently clear; it is for a complete search of the cell phone. It is not limited in any way.

So in this way, the government has satisfied its burden of establishing that consent was knowing, voluntary, intelligent. There's no evidence of coercion. And the form itself clearly explained the scope along with Special Agent Johnston's statement that it includes "Whisper, et cetera," and the entire conversation investigation.

So with that, the defendant's motion to suppress is denied.

The Court does need to establish dates now going forward at present. The speedy trial period expires on March 1st. The Court can set a trial date to begin jury selection on February 26. That's a short timeframe, but I do want to hear from the parties as to that timeframe.

Ms. Schnellinger is looking at her phone, so I'll start with you, Mr. Bryan.

MR. BRYAN: Your Honor, I am currently scheduled for trial on March 3rd in front of Judge Pearson. And in all honesty, there is a motion pending in that matter that has a motion to continue that hasn't been ruled upon.

I would also not -- I would also suggest that I'm not sure that this case is a case that will be tried, so if we could have some time to set it for a final pretrial and so I can discuss possible resolutions with the government and Mr. James, that would be I think prudent.

THE COURT: Are you asking then to extend the speedy trial period to allow for more time?

MR. BRYAN: Absolutely, Your Honor.

THE COURT: And, Mr. James --

Well, I'll ask the government, do you have any objection?

MS. SCHNELLINGER: No, Your Honor.

THE COURT: And, Mr. James, I'm pulling up the docket right now. It's taking a moment to load, but I know you and your counsel have previously discussed your speedy trial rights, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you've previously waived those rights, but I want to be sure even today that you understand

that you have the right to have your case tried within now the recognized speedy trial period. But the Court can extend that when situations like this arise when your counsel would like additional time to meet with you in light of the Court's ruling to meet with the government about possible plea negotiations and have additional time to prepare for trial, if necessary.

Do you understand those are the reasons he's seeking an extension of the speedy trial period?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you agree with that extension?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I find that your agreement is both knowing and voluntary, and so I will grant the motion to extent the speedy trial period.

What I will do, I'm going to extend it to May 1st, but I'm not -- I'm not pushing -- I'm not setting a trial date that far out. I hope counsel understands. I think this can probably be set sooner than that.

The Court can set a trial date of April 14th with the final pretrial on March 31st at 1 PM.

MR. BRYAN: Your Honor, both of those dates work for my calendar.

THE COURT: All right.

Let me just double-check.

MS. SCHNELLINGER: Yes, Your Honor. Those work for us as well. Thank you.

THE COURT: All right. Thank you.

So those are the dates that I will set.

March 31st for a final pretrial at 1 PM.

I will ask that if there's going to be a change of plea, that the Court's notified by March 26th, but the trial date will be April 14th.

Are there any other matters to address before we adjourn, on behalf of the government?

MS. SCHNELLINGER: No, Your Honor. Thank you.

THE COURT: On behalf of Mr. James?

MR. BRYAN: No. Thank you, Your Honor.

THE COURT: Thank you.

Mr. James, those are the dates the Court will set. There will be an extension of time so that you and your counsel can meet and discuss next steps.

At this time we are now adjourned. Thank you, everyone.

(Proceedings concluded at 9:44 a.m.)

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

*/s/ Gregory S. Mizanin* *August 4, 2025*

GREGORY S. MIZANIN, RDR, CRR DATE